**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., | ) ) ) |
| Defendant. | ) ) |

Case No. 8:16-cv-00860-DKC

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1100
Washington, D.C. 20001-4501
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

FACTS ................................................................................................................................... 3

ARGUMENT ......................................................................................................................... 6

    I.    This Court Has Subject Matter Jurisdiction ............................................................ 6

        A.    Federal Question Jurisdiction Exists ........................................................... 6

        B.    The Court's Jurisdiction Is Unaffected by the Administrative Review Scheme ............................................................................................... 6

        C.    Administrative Exhaustion Is Unnecessary ............................................... 12

    II.    Plaintiffs Are Entitled to a Preliminary and Permanent Injunction ..................... 15

        A.    Plaintiffs Are Correct on the Merits .......................................................... 16

        B.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief ........... 25

        C.    The Balance of Equities and the Public Interest Strongly Favor Plaintiffs ..................................................................................................... 27

CONCLUSION ................................................................................................................... 29

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Gambell*,
   480 U.S. 531 (1986)....................................................................................16

*Bebo v. SEC*,
   799 F.3d 765 (7th Cir. 2015) ........................................................................11

*Bennett v. SEC*,
   2015 WL 9183445 (D. Md. Dec. 17, 2015).................................................8, 9

*Chau v. SEC*,
   72 F. Supp. 3d 417 (S.D.N.Y. 2014)..............................................................10

*City of Arlington, Tex. v. FCC*,
   133 S. Ct. 1863 (2013)...................................................................................24

*Cont'l Can Co., U.S.A. v. Marshall*,
   603 F.2d 590 (7th Cir. 1979) ....................................................................13, 25

*Duncan v. Walker*,
   533 U.S. 167 (2001).......................................................................................19

*Elgin v. Dep't of Treasury*,
   132 S. Ct. 2126 (2012).....................................................................................9

*Fed. Mar. Comm'n v. Seatrain Lines, Inc.*,
   411 U.S. 726 (1973).......................................................................................23

*Free Enterprise Fund v. PCAOB*,
   561 U.S. 477 (2010)...........................................................................6, 7, 10, 11

*Fiero v. Fin. Indus. Regulatory Auth.*,
   660 F.3d 569 (2d Cir. 2011)..............................................................6, 19, 20, 23

*First Jersey Sec., Inc. v Bergen*,
   605 F.2d 690 (3d Cir. 1979)...............................................................11, 12, 15

*Guitard v. U.S. Sec'y of Navy*,
   967 F.2d 737 (2d Cir. 1992)...........................................................................12

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ................................................28

*Int'l Controls Corp. v. Vesco*,
    490 F.2d 1334 (2d Cir. 1974)................................................28

*Kunz v. SEC*,
    64 F. App'x 659 (10th Cir. 2003) ........................................21

*Leedom v. Kyne*
    358 U.S. 184 (1958).............................................................15

*Maages Auditorium v. Prince George's Cty., Md.*,
    4 F. Supp. 3d 752 (D. Md. 2014)..........................................15

*Manual Enters. v. Day*,
    370 U.S. 478 (1962)...............................................................8

*Mayor & City Council of Balt. v. Mathews*,
    562 F.2d 914 (4th Cir. 1977) ....................................11, 12, 15

*Martin–Trigona v. Shiff*,
    702 F.2d 380 (2d Cir. 1983)..................................................25

*McDonald v. Centra, Inc.*,
    946 F.2d 1059 (4th Cir. 1991) ..................................12, 13, 14

*Mohamed v. Holder*,
    995 F. Supp. 2d 520 (E.D. Va. 2014) ...................................13

*Morgan Keegan & Co., Inc. v. Louise Silverman Trust*,
    2012 WL 113400 (D. Md. Jan. 12, 2012)..............................13

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ...............................................28

*Philip Morris, Inc. v. Block*,
    755 F.2d 368 (4th Cir. 1985) ....................................11, 12, 15

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................19

*Sorrell v. SEC*,
    679 F.2d 1323 (9th Cir. 1982) ..............................................21

*Standard Inv. Chartered, Inc., v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  637 F.3d 112 (2d Cir. 2011).........................................................................27

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)........................................................................................8

*Touche Ross & Co. v. SEC*,
  609 F.2d 570 (2d Cir. 1979)...................................................................11, 14

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994).........................................................................6, 7, 8, 10

*United States v. Members of Estate of Boothby*,
  16 F.3d 19 (1st Cir. 1994)......................................................8, 9, 11, 25, 28

*United States v. Ruzicka*,
  329 U.S. 287 (1946)....................................................................................10

*Walker v. Luther*,
  830 F.2d 1208 (2d Cir. 1987).....................................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..............................................................................15, 16, 27

*World Trade Fin. Corp. v. SEC*,
  739 F.3d 1243 (9th Cir. 2014) ...................................................................21

**Statutes, Rules, and Legislative Materials**

15 U.S.C. § 78aa ..............................................................................................6

15 U.S.C. § 78c ........................................................................................18, 19

15 U.S.C. § 78o-3 ...............................................................................16, 17, 21

15 U.S.C. § 78s.......................................................................5, 6, 17, 18, 26

15 U.S.C. § 78t..............................................................................................18

15 U.S.C. § 78y.....................................................................................5, 6, 26

28 U.S.C. § 1331 .............................................................................................6

28 U.S.C. § 1337 .............................................................................................6

28 U.S.C. § 1651 .............................................................................................6

28 U.S.C. § 2201 ................................................................................................................6

FINRA Rule 2010 .............................................................................................................2

FINRA Rule 8310 .......................................................................................................4, 26

FINRA Rule 9311 .............................................................................................................5

FINRA Rule 9312 .............................................................................................................5

FINRA Rule 9349 .............................................................................................................5

FINRA Rule 9351 .............................................................................................................5

Fed. R. Civ. P. 65(c) ......................................................................................................28

Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97....................17, 19

Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881............................17

**Secondary Sources**

Lee A. Pickard & Anthony W. Djinis, *NASD Disciplinary Proceedings: Practice and Procedure*, 37 Bus. Law. 1213 (1982) ...........................................................22

Norman J. Singer et al., *Sutherland Statutes and Statutory Construction* (7th ed. 2015) ...............................................................................................................................23

Scottsdale Capital Advisors Corporation ("SCA"), John J. Hurry, Timothy B. DiBlasi, and Darrel Michael Cruz (collectively "Plaintiffs") respectfully submit this Memorandum of Law in support of their motion to preliminarily and permanently enjoin the Financial Industry Regulatory Authority, Inc. ("FINRA") from continuing to prosecute a disciplinary proceeding that is outside of the jurisdiction conferred upon FINRA by the Securities Exchange Act of 1934 (the "Exchange Act").

## INTRODUCTION

SCA is a FINRA-registered broker-dealer.  Mr. Hurry is SCA's co-founder and one of its directors.  Mr. DiBlasi is SCA's Chief Compliance Officer.  Mr. Cruz is SCA's former President. Together, Plaintiffs invoke this Court's equitable power to enjoin an ultra vires administrative action.  Despite its limited statutory mandate under the Exchange Act, FINRA, a private, non-governmental body that regulates broker-dealers, has instituted a disciplinary proceeding against Plaintiffs for alleged violations of a separate statute—the Securities Act of 1933 (the "Securities Act").  In so doing, FINRA has violated the securities-industry regulatory scheme devised by Congress, which vests the Securities and Exchange Commission ("SEC") with exclusive authority to bring disciplinary proceedings against broker-dealers and their associated persons for alleged violations of the Securities Act (and other specified federal securities laws). FINRA's ultra vires proceeding has caused and will continue to cause Plaintiffs to suffer immediate and irreparable harm.  Injunctive relief, therefore, is both necessary and justified.

In May 2015, FINRA initiated a disciplinary proceeding against Plaintiffs (FINRA Case No. 2014041724601), asserting violations of Section 5 of the Securities Act, which generally prohibits the public distribution of unregistered securities absent an exemption.  The Section 5

claims are the predicate for charged violations of FINRA Rule 2010, the organization's general ethical rule, which provides that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."  FINRA R. 2010.

FINRA's disciplinary authority is governed by Sections 15A and 19 of the Exchange Act. Together, these provisions permit FINRA to discipline its members only for violations of "this chapter," "the rules and regulations thereunder," and the organization's own rules.  Because the Exchange Act occupies a different chapter in the United States Code from the Securities Act, the plain and unambiguous text of FINRA's enabling legislation forecloses disciplinary actions premised upon alleged violations of the Securities Act.  Further, other provisions of the Exchange Act—including Section 19(h), which sets forth the disciplinary authority of the SEC— specifically refer to the Securities Act or use statutorily defined terms that encompass the Securities Act, thereby conclusively demonstrating Congress's intent to limit FINRA's enforcement power to the provisions of the Exchange Act.

Plaintiffs have raised FINRA's lack of jurisdiction with FINRA, to no avail.  Specifically, Plaintiffs requested that the Hearing Officer in the disciplinary proceeding dismiss the complaint for want of statutory authority, but the Hearing Officer—an attorney employed by FINRA— denied Plaintiffs this relief.  In a written order, the Hearing Officer concluded that FINRA may assert jurisdiction over any law under the guise of FINRA Rule 2010, despite the Exchange Act's express textual limitations, as long as the conduct at issue relates to "just and equitable principles of trade" and "protect[ion] of investors and the public interest."  This interpretation of FINRA's enabling legislation subverts the statutory text and renders the disciplinary proceeding ultra vires.

2

The FINRA proceeding is scheduled for a two-week hearing commencing June 13, 2016.

FINRA ordered this hearing to take place in Los Angeles even though Plaintiffs all reside in

either Arizona or Nevada, and none of the alleged conduct has any nexus to California.

Plaintiffs' preparation for the hearing, including incurring significant legal fees and expenses for

the completion of witness and exhibit lists and pre-hearing briefing, will begin imminently, with

significant deadlines approaching in mid-April.  Accordingly, injunctive relief is necessary, both

to preserve Plaintiffs' right not to submit to an ultra vires proceeding and to shield Plaintiffs from

irreparable reputational and financial harm, as well as the irremediable loss of their claims

through mootness.

## FACTS

Mr. Hurry and his wife, Justine, formed SCA in 2001.  Ex. A (Henry Diekmann Decl.)

¶ 6.  Since that time, the company has grown to become a leader in microcap-securities trading in

the OTC market.  *Id.*

In 2013, Mr. Hurry organized Cayman Securities Clearing and Trading SEZC Ltd.

("CSCT") in the Special Economic Zone of the Cayman Islands to serve as an offshore broker-

dealer for foreign clients.  Ex. A ¶ 9.  CSCT became a customer of SCA and, through its account

there, deposited and liquidated penny stocks on behalf of its own customers.  Ex. A ¶ 10.   In

early 2014, FINRA commenced an investigation of SCA.  FINRA's investigation focused on

four foreign entities that deposited and sold unregistered stock at CSCT, which in turn routed the

transactions to SCA.  Ex. A ¶ 12.

On May 15, 2015, FINRA instituted a disciplinary proceeding against Plaintiffs.

FINRA's complaint alleges, in sum and substance, that (i) certain transactions in unregistered

securities that CSCT routed through SCA on behalf of several CSCT customers violated Section 5 of the Securities Act and (ii) Plaintiffs' supervisory processes and procedures were not reasonably designed to detect and prevent violations of Section 5.  Ex. B (FINRA Compl.) ¶¶ 143–96.  As a result of these purported Securities Act violations, the complaint charges Plaintiffs with violating FINRA Rule 2010, the organization's catch-all ethical rule.  Ex. B ¶¶ 156, 176, 196.  FINRA has requested that the Hearing Officer "order that one or more of the sanctions provided under FINRA Rule 8310(a) be imposed, including but not limited to full disgorgement of any and all ill-gotten gains . . . , together with interest."  Ex. B at 42.  Rule 8310(a) authorizes FINRA to impose a variety of penalties on its members, including censure, fines, suspension of FINRA membership or registration, expulsion from FINRA, cancellation or revocation of FINRA membership, suspension from or bars on association with FINRA members, entry of temporary or permanent cease-and-desist orders, and "any other fitting sanction."  FINRA R. 8310(a).  Neither FINRA nor any other regulatory body has found that Plaintiffs engaged in wrongdoing, and Plaintiffs deny the allegations in FINRA's complaint.

In December 2015, Plaintiffs moved FINRA for summary disposition on various grounds, including the fundamental basis that the disciplinary proceeding exceeded FINRA's authority under the Exchange Act.  Ex A. ¶ 14.  On February 26, 2016, the Hearing Officer, a FINRA-employed attorney, denied Plaintiffs' motion.  Ex. C (Order Mot. Summ. Disposition).  The hearing officer concluded that the Exchange Act, by empowering FINRA to promulgate and enforce its own rules, "expressly authorizes" a disciplinary proceeding predicated on violations of the Securities Act.  Ex. C at 6–7.  In the Hearing Officer's view, the Exchange Act's general grant of authority to FINRA to formulate rules designed "to promote just and equitable principles

4

of trade" and "to protect investors and the public interest" trumps every specific limitation in the statute, including the Exchange Act's disparate grants of authority to FINRA and the SEC.  *Id.*

The FINRA proceeding is scheduled for a two-week hearing beginning June 13, 2016. Ex. D (Case Mgmt. Order).  Deadlines to prepare briefs and witness and exhibit lists are imminent.  *Id.*  The hearing will take place in Los Angeles, California, on the Hearing Officer's order.  Ex. E (Order Setting Hr'g Los Angeles).

If FINRA prevails in the hearing, Plaintiffs must navigate FINRA's internal appellate process before seeking SEC review.  According to FINRA's rules, a party may appeal the FINRA Hearing Officer's decision to the FINRA National Adjudicatory Council ("NAC"), FINRA R. 9311, or the NAC may initiate a review of the decision sua sponte, FINRA R. 9312. If no appeal is sought, or if the appeal is denied, then the decision becomes final unless the FINRA Board of Governors independently calls for review.  FINRA R. 9349, 9351.  The FINRA Board "may affirm, modify, or reverse" the NAC's decision; "affirm, modify, reverse, increase, or reduce any sanction . . . , or impose any other fitting sanction"; or "remand the disciplinary proceeding with instructions." FINRA R. 9351(d).  After the decision becomes final within FINRA, the defendant may petition the SEC for review.  15 U.S.C. § 78s(d)(2).  Once the SEC enters a "final order," the defendant "may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit."  *Id.* § 78y(a)(1).

<u>**ARGUMENT**</u>

**I.     <u>This Court Has Subject Matter Jurisdiction</u>**

     **A.     Federal Question Jurisdiction Exists**

       This Court has federal subject matter jurisdiction pursuant to 15 U.S.C. § 78aa and

28 U.S.C. §§ 1331, 1337, 1651, and 2201 because this suit arises under federal law—namely, the

Exchange Act.  Further, federal courts have jurisdiction to decide whether FINRA has acted

within its statutory authority.  *See Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 573

& n.5 (2d Cir. 2011).

     **B.     The Court's Jurisdiction Is Unaffected by the Administrative Review Scheme**

       This Court's subject matter jurisdiction is unchanged by the Exchange Act's system of

administrative review.  The Exchange Act provides that the disciplinary decisions of self-

regulatory organizations like FINRA are subject to review, first by the SEC and then by a federal

court of appeals.  *See* 15 U.S.C. §§ 78s(d), 78y(a).  Under the Supreme Court's reasoning in the

*Thunder Basin* line of cases, an administrative review scheme will divest federal district courts

of jurisdiction only if there is a clear congressional intent to address the type of claim at issue

exclusively within that scheme.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–16

(1994); *see also, e.g.*, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489–91 (2010).  This limited

exception to original federal jurisdiction does not apply here because, notwithstanding the

possibility of eventual federal appellate review, a jurisdictional challenge to a self-regulatory

organization's disciplinary proceedings is not the type of claim Congress directed only to the

administrative system.

At the outset, the text of 15 U.S.C. § 78y, which prescribes appellate review of final SEC decisions, "does not expressly limit the jurisdiction that other statutes confer on district courts," including 28 U.S.C. §§ 1331 and 2201.  *Free Enter. Fund*, 561 U.S. at 489.  Indeed, as suggested above, the Supreme Court has made clear that "[p]rovisions for agency review do not restrict judicial review unless the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'"  *Id*. (quoting *Thunder Basin*, 510 U.S. at 207, 212).  Courts "presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'"  *Id*. (quoting *Thunder Basin*, 510 U.S. at 212–13)).  Each of the factors that trigger this presumption of preserved federal subject matter jurisdiction are present here.

First, Plaintiffs' claims relating to FINRA's statutory authority are not "of the type Congress intended to be reviewed" through a multi-tiered system of internal adjudications.  *Id*. To the contrary, these claims are wholly collateral to this system and are outside the expertise of both FINRA and the SEC.  Plaintiffs here contest FINRA's statutory authority to prosecute this disciplinary action, not FINRA's interpretation of any particular securities law, FINRA's factual findings, or FINRA's choice of adjudicative forum and any resulting constitutional implications. Thus, Plaintiffs' challenge to the very existence of the disciplinary proceeding is akin to the suit the Supreme Court held to be within federal jurisdiction in *Free Enterprise Fund*.  *See id*. at 490 (observing that "petitioners object to the Board's existence, not to any of its auditing standards"). This posture also distinguishes the instant case from *Thunder Basin*, in which the petitioners

challenged an agency's interpretation of a statute and a regulation relating to the conduct of mine inspections, 510 U.S. at 214–15, and from recent cases attempting to enjoin SEC administrative proceedings on the grounds that the manner in which the SEC has appointed its administrative law judges violates Article II of the Constitution, *see, e.g.*, *Bennett v. SEC*, No. PWG-15-3325, 2015 WL 9183445, at *1, *9 (D. Md. Dec. 17, 2015).

Unlike the matter now before this Court, neither *Thunder Basin* nor the SEC cases have questioned whether the types of charges levied by the agency could even be tried in the particular administrative forum.  For example, in *Bennett*, the SEC filed a complaint in an in-house forum charging Bennett Group Financial Services, LLC and its founder and CEO, Dawn Bennett, with violating various provisions of the Securities Act, the Exchange Act, and the Investment Advisers Act of 1940.  *See Bennett Grp. Fin. Servs., LLC*, Exchange Act Release No. 75864 (Sept. 9, 2015).  In their federal suit to enjoin the proceeding, the defendants did not contest the SEC's statutory authority to try violations of the federal securities laws; rather, they disputed the constitutionality of the SEC's use of ALJs in this context, asserting that the prescribed means of appointing and removing ALJs contravenes Article II.  *See Bennett*, 2015 WL 9183445, at *1, *9.  This is fundamentally different from the present case, which challenges FINRA's statutory authority to even *initiate* a disciplinary proceeding based on alleged violations of the Securities Act.  Indeed, in contrast with the constitutionality of an appointment-and-removal system, the threshold question of agency jurisdiction cannot await resolution in a later proceeding, as "an action taken by an agency lacking jurisdiction is a nullity," *United States v. Members of Estate of Boothby*, 16 F.3d 19, 21 n.1 (1st Cir. 1994) (citing *Manual Enters. v. Day*, 370 U.S. 478, 499 n.5 (1962)); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (rejecting the doctrine

of "hypothetical jurisdiction" because "it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers").

Moreover, it would be illogical to presume that Congress intended jurisdictional challenges, which question the fundamental competency of a forum, to proceed through an administrative review system.  When a party pursues a substantive appeal or asserts a constitutional claim arising from the conduct of agency proceedings, that party acknowledges the agency's authority but maintains that the exercise of that authority has caused legally cognizable harm.  *See, e.g.*, *Bennett*, 2015 WL 9183445, at *1, *9 (describing the legal basis of the plaintiffs' constitutional attack on the SEC's decision to prosecute them in an administrative tribunal).  Administrative review is rational in these circumstances, as the party has submitted to the agency's authority to regulate the substantive conduct at issue and the agency—or, if necessary, the court of appeals—can afford relief consistent with the administrative system.  *See, e.g.*, *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2139–40 (2012) (noting that the plaintiffs' constitutional challenges to the statute that mandated their dismissal from federal employment could be decided eventually by the court of appeals and remarking that the plaintiffs' constitutional claims were "the vehicle by which they seek to reverse the removal decisions [and] . . . return to federal employment," relief that the administrative review statute "routinely affords").  By contrast, when a party avers that the agency lacks jurisdiction altogether, relief cannot properly be fashioned within the administrative system; not only are all of the agency's actions legally void, *see Boothby*, 16 F.3d at 21 n.1, but, as explained below, any eventual remedy will fail to correct this fundamental defect in the proceedings.

Relatedly, unlike the disputes in *Thunder Basin* and *Bennett* et al., neither FINRA nor the SEC has any particular expertise that furthers the analysis of the issues presented here.  FINRA's expertise concerns various aspects of the Exchange Act and related issues affecting broker-dealers.  The SEC's expertise concerns the substantive provisions of the federal securities laws.  Plaintiffs have asserted claims regarding the proper interpretation of the scope of FINRA's enabling legislation, a subject implicating general principles of statutory interpretation and ascertainment of congressional intent.  These principles bear no relation to the substantive expertise of FINRA or the SEC; to the contrary, they are within the core competence of the federal judiciary.

In crafting Sections 15A and 19 of the Exchange Act, Congress set plain and unambiguous limits on FINRA's authority.  *See infra* Section II.A.  Nothing indicates that Congress chose to leave open any jurisdictional issues on which the substantive expertise of FINRA or the SEC later could be brought to bear.  *Cf. Thunder Basin*, 510 U.S. at 214–15 (endorsing exclusive agency review of challenges to enforcement actions under the Mine Act in light of the agency's expertise interpreting the substantive provisions of that act); *Chau v. SEC*, 72 F. Supp. 3d 417, 435–36 (S.D.N.Y. 2014) (discussing the SEC's experience evaluating which types of cases should be filed in an administrative forum instead of federal court).  As the Court wrote in *Free Enterprise Fund*, contrasting *Thunder Basin* and *United States v. Ruzicka*, 329 U.S. 287 (1946), which "reserved for the agency fact-bound inquiries that . . . rested ultimately on factors that call for an understanding of the [specific] industry," "[n]o similar expertise is required here, and the statutory questions involved do not require technical considerations of agency policy." *Free Enter. Fund*, 561 U.S. at 491.

Second, and more importantly, Plaintiffs would be denied "all meaningful judicial review" if forced to submit to an ultra vires administrative proceeding.  *Id.* at 489; *see also*, *e.g.*, *Bebo v. SEC*, 799 F.3d 765, 775 (7th Cir. 2015) (declaring this the primary factor).  The disciplinary action to which Plaintiffs have been subjected exceeds FINRA's statutory authority under the Exchange Act, rendering the entire proceeding ultra vires.  Although Plaintiffs ultimately may obtain federal appellate review of this claim after several administrative appeals, that belated judicial review would not be meaningful, as compelled submission to an unlawful proceeding constitutes the very harm that Plaintiffs seek to avoid.  *See Boothby*, 16 F.3d at 21 n.1 (remarking that "an action taken by an agency lacking jurisdiction is a nullity").  In fact, as discussed later, courts recognize challenges to an agency's fundamental authority as grounds for excusing administrative exhaustion, signaling that delayed judicial review of these types of contentions fails to afford adequate relief.  *See, e.g.*, *Philip Morris, Inc. v. Block*, 755 F.2d 368, 369–70 (4th Cir. 1985) (noting that exhaustion is excused "when an agency acts in 'brazen defiance' of its statutory authorization" (quoting *Mayor & City Council of Balt. v. Mathews*, 562 F.2d 914, 920 (4th Cir. 1977) (en banc), *vacated on other grounds*, 571 F.2d 1273 (4th Cir. 1978) (en banc))); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 696 (3d Cir. 1979) (recognizing an exception to the general requirement of exhaustion when the agency has committed "a clear and unambiguous statutory . . . violation"); *cf. Touche Ross & Co. v. SEC*, 609 F.2d 570, 577 (2d Cir. 1979) (excusing exhaustion in a challenge to an SEC proceeding, even though that proceeding was "not 'plainly beyond [the SEC's] jurisdiction,'" because "to require appellants to exhaust their administrative remedies would be to require them to submit to

the very procedures which they are attacking"). This reasoning is equally applicable here, as judicial review cannot be "meaningful" if it fails to alleviate irreparable harm.

### C.       Administrative Exhaustion Is Unnecessary

Further, Plaintiffs are not required to exhaust their administrative remedies before bringing this suit because several settled exceptions to the administrative-exhaustion doctrine apply. In this Circuit, administrative exhaustion is excused when, among other circumstances, "(1) the dispute is a matter of statutory construction; (2) the utilization of administrative procedures would cause irreparable injury; and (3) the resort to administrative procedures would be futile." *McDonald v. Centra*, Inc., 946 F.2d 1059, 1063 (4th Cir. 1991). This Circuit also has embraced the venerable precept that "judicial intervention is authorized when an agency acts in 'brazen defiance' of its statutory authorization." *Block*, 755 F.2d at 369–70 (quoting *Mathews*, 562 F.2d at 920). Other circuits recognize broadly similar exceptions. *See, e.g.*, *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 741 (2d Cir. 1992) (listing as "established exceptions to the exhaustion rule" instances where "(1) available remedies provide no 'genuine opportunity for adequate relief'; (2) irreparable injury may occur without immediate judicial relief; [and] (3) administrative appeal would be 'futile'"); *First Jersey Sec.*, 605 F.2d at 696 (observing that exhaustion is excused "1) when the administrative procedure is clearly shown to be inadequate to prevent irreparable injury; or 2) when there is a clear and unambiguous statutory or constitutional violation"). For related reasons, Plaintiffs' case is covered by each of these exceptions.

First, this is a matter of pure statutory construction, *McDonald*, 946 F.2d at 1063, concerning the limits of FINRA's statutory authority. Plaintiffs maintain that FINRA's disciplinary proceeding exceeds its authority under the Exchange Act, and the relief Plaintiffs

seek is restricted to (i) a declaration that FINRA's enabling legislation does not extend to enforcement of the Securities Act and (ii) an injunction against a disciplinary proceeding that violates this statutory limit.  Plaintiffs do not request that the Court address any legal issues related to the substance of the disciplinary proceeding; the Court's role is limited to addressing the proper construction of the Exchange Act's grant of disciplinary authority to FINRA.

Second, "the utilization of administrative procedures would cause irreparable injury," *McDonald*, 946 F.2d at 1063, and "the available administrative remedies would be insufficient," *Mohamed v. Holder*, 995 F. Supp. 2d 520, 533 (E.D. Va. 2014).  Forcing Plaintiffs to participate in an ultra vires proceeding, and then to appeal through multiple levels of administrative review before reaching a federal court, would amount to an irreparable injury.  *See, e.g.*, *Cont'l Can Co., U.S.A. v. Marshall*, 603 F.2d 590, 597 (7th Cir. 1979) (excusing exhaustion in a challenge to "duplicative" and "harassing" administrative hearings and reasoning that "[i]f [the defendant] is forced to defend the numerous prosecutions on the merits before the Commission prior to seeking a judicial determination that the prosecutions were unwarranted, the injury will have already been complete and uncorrectable"); *see also, e.g.*, *Morgan Keegan & Co., Inc. v. Louise Silverman Trust*, No. JFM-11-2533, 2012 WL 113400, at *5 (D. Md. Jan. 12, 2012) (holding that forcing a plaintiff to expend resources that cannot later be recovered to participate in an arbitration that the plaintiff never agreed to is per se irreparable injury).  Further, even if Plaintiffs succeed on the merits in the FINRA disciplinary hearing, thereby bringing an end to the proceeding, FINRA's ultra vires conduct would evade judicial review altogether, forever depriving Plaintiffs of any remedy for the harm associated with submission to an unlawful proceeding.  *See Cont'l Can Co.*, 603 F.2d at 597.

Third, "resort to administrative procedures would be futile," *McDonald*, 946 F.2d at 1063, in light of the nature of Plaintiffs' harm and FINRA's inability to neutrally assess its own statutory jurisdiction.  Indeed, the FINRA-employed attorneys tasked with adjudicating hearings cannot be expected to resolve a statutory question of first impression in a way that limits FINRA's jurisdiction, especially when FINRA itself has taken the view that it has boundless authority to enforce any of the federal securities laws.  To be sure, Plaintiffs provided the Hearing Officer with an opportunity to address the jurisdictional defects in this proceeding, but the Hearing Officer unsurprisingly sided with FINRA and endorsed its facially erroneous reading of the Exchange Act, confirming the futility of seeking relief administratively.

Fourth, requiring further exhaustion would not advance the purposes of the exhaustion doctrine, which include "giving the agency an opportunity to develop a factual record, permitting it to exercise its discretion or to apply its expertise, and promoting efficiency by barring the premature interruption of the administrative process." *Touche Ross*, 609 F.2d at 576.  In *Touche Ross*, the plaintiffs challenged the SEC's statutory authority to promulgate a rule authorizing administrative disciplinary proceedings for violations of the federal securities laws, averring that the legal infirmity of this rule rendered the SEC proceeding pending against them ultra vires.  *Id.* at 573.  The Second Circuit held that exhaustion was excused with respect to this claim, even though the SEC's authority was "not 'plainly beyond its jurisdiction as a matter of law,'" because "the issue [was] one of purely statutory interpretation" and there was no need to develop a factual record or defer to agency expertise or discretion.  *Id.* at 576–77.  Importantly, the Second Circuit also was persuaded by the reality that exhaustion would "require [the plaintiffs] to submit to the very procedures which they are attacking." *Id.* at 577.  So too here.  Plaintiffs

raise a question of statutory interpretation that is uniquely appropriate for the federal courts and requires neither agency expertise nor a factual record, and demanding exhaustion here would only perpetuate the harm Plaintiffs seek to enjoin.

Whether a regulator is acting within the scope of its enabling legislation is a serious matter with serious consequences, and courts therefore recognize the need for immediate intervention to resolve allegations that a regulator is acting beyond its statutory authority. *See, e.g.*, *Leedom v. Kyne*, 358 U.S. 184, 189–90 (1958) (recognizing original federal jurisdiction over a suit to vacate an NLRB action that clearly violated the NLRA and explaining that "[t]his Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers"); *accord Block*, 755 F.2d at 369–70; *First Jersey Sec.*, 605 F.2d at 696. Where, as here, an agency acts contrary to the plain text of its enabling legislation, "the courts will not wait for the underlying proceedings to run their course"; "[r]ather, the[y] will intervene to preserve the status quo, prevent the infringement of substantial rights that might otherwise be sacrificed, and protect against the subversion of congressional policy." *Mathews*, 562 F.2d at 920.

## II.   <u>Plaintiffs Are Entitled to a Preliminary and Permanent Injunction</u>

To secure a preliminary injunction, the plaintiff must establish that "(1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Maages Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 (D. Md. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). There must be a clear showing that harm is imminent; it is not enough that harm may be possible at some future date.

15

*Winter*, 555 U.S. at 22.  "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."  *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1986).  As explained below, Plaintiffs satisfy the four factors necessary for injunctive relief.

### A.       Plaintiffs Are Correct on the Merits

An examination of the text and structure of the Exchange Act reveals that FINRA has no statutory authority to enforce the Securities Act and, correspondingly, demonstrates that Plaintiffs' challenge is meritorious.

>        1.   *Exchange Act Sections 15A and 19(g) Together Limit FINRA's Disciplinary Authority Surrounding the Federal Securities Laws to the Exchange Act*

As a registered national securities association ("RSA") and self-regulatory organization ("SRO"), FINRA's authority to sanction member firms and their associated persons is governed by Sections 15A and 19 of the Exchange Act.  With respect to the federal securities laws, Sections 15A(b), 15A(h), and 19(g) expressly limit FINRA's disciplinary authority to violations of the Exchange Act.

Concerning RSAs, Section 15A(h) provides: "A determination by the association to impose a disciplinary sanction shall be supported by a statement setting forth . . . the specific provision of *this chapter*, the rules or regulations thereunder, . . . or the rules of the association which any such act or practice, or omission to act, is deemed to violate."  15 U.S.C. § 78o-3(h)(1)(B) (emphasis added).  Section 15A(b) contains an identical grant of disciplinary authority.  *See id.* § 78o-3(b)(2), (7) (requiring an RSA (i) to have capacity "to enforce compliance by its members and [associated persons], with the provisions of *this chapter*, the rules and regulations thereunder, . . . and the rules of the association" and (ii) to promulgate rules

providing for discipline of members "for violation of any provision of *this chapter*, the rules or regulations thereunder, . . . or the rules of the association" (emphasis added)).

Concerning SROs, Section 19(g) requires an SRO to "comply with the provisions of *this chapter*, the rules and regulations thereunder, and its own rules" and empowers it to "enforce compliance[,] in the case of a registered securities association [such as FINRA], with *such provisions* . . . by its members." *Id.* § 78s(g)(1)(B) (emphasis added).

The term "this chapter" in Sections 15A(b), 15A(h), and 19(g) refers to the chapter of the United States Code where FINRA's enabling legislation appears: Chapter 2B of Title 15 of the Code—the Exchange Act. This conclusion is confirmed by the original text of the Exchange Act and the amendments that added the language now codified in §§ 78o-3 and 78s: all contain the phrase "this title" in place of "this chapter," referring to Title I of the Exchange Act. *See* Securities Exchange Act of 1934, Pub. L. No. 73-291, ch. 404, tit. I, 48 Stat. 881, 881; *see also* Securities Acts Amendments of 1975, Pub. L. No. 94-29, sec. 12(2), (4), § 15A(b)(2), (7), (h)(1)(B), 89 Stat. 97, 127–28, 130; *id.* sec. 16, § 19(g)(1)(B), 89 Stat. at 152.

       2.  *Exchange Act Section 19(h) Designates the SEC as the Sole Regulator Empowered to Discipline RSA/SRO Members for Violating the Securities Act*

Consistent with this framework, Section 19(h) specifically names the SEC as the only regulatory body with statutory authority to sanction RSA and SRO members (i.e., broker-dealers that are members of FINRA and their associated persons) for violations of the Securities Act and other federal securities laws.[1] Section 19(h) provides:

---

[1] Plaintiffs use the term "disciplinary proceedings" to refer to the sanctions authorized under Sections 15A and 19 of the Exchange Act, including industry suspensions and associational bars. *See, e.g.*, 15 U.S.C. §§ 78o-3(b)(6), 78s(h)(3). The Securities Act directly authorizes both the SEC and the Department of Justice to institute criminal and civil proceedings for violations of that statute and to seek other forms of relief provided for in that statute. *See, e.g., id.* § 78t.

The appropriate regulatory agency for a national securities exchange or registered securities association is authorized, by order, if in its opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter, to suspend for a period not exceeding twelve months or to bar any person from being associated with a member of such national securities exchange or registered securities association, . . . if such appropriate regulatory agency finds, on the record after notice and opportunity for hearing, that such person has willfully violated or has effected any transaction for any other person who, such person associated with a member had reason to believe, was violating with respect to such transaction—

. . . .

(B) in the case of a registered securities association, any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, this chapter, the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board.

15 U.S.C. § 78s(h)(3).[2]

Section 3 of the Exchange Act, in turn, defines the "appropriate regulatory agency" for an RSA as the SEC. *Id.* § 78c(a)(34)(E).[3] The difference between the express grants of disciplinary authority in Sections 15A(b), 15A(h), and 19(g), on one hand, and Section 19(h), on the other, is clear. While the SEC may sanction broker-dealers for violations of any of the federal securities laws enumerated in section 19(h), the authority of FINRA to sanction its members is limited to violations of the Exchange Act.

Indeed, when Congress added Section 19 to the Exchange Act in 1975, it used the phrases "the Securities Act of 1933" and "the securities laws"—a term Section 3 defines to

---

[2] Section 19(h)(2) contains an essentially identical grant of authority to "[t]he appropriate regulatory agency for a self-regulatory organization." 15 U.S.C. § 78s(h)(2).

[3] Although the Exchange Act does not specifically define the "appropriate regulatory agency for a self-regulatory organization," the surrounding definitions make plain that such an agency must be a governmental body. *See id.* § 78c(a)(34) (listing the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC, and the SEC as "appropriate regulatory agenc[ies]" of different market participants).

include the Securities Act, the Exchange Act, and the Investment Company Act of 1940, among other federal laws, *id.* § 78c(a)(47)—in numerous provisions *other than* those relating to RSAs and SROs like FINRA.[4]  In the subsections relating to FINRA's jurisdiction, Congress opted neither to list the Securities Act by name, as in Section 19(h), nor to use Section 3's inclusive shorthand.  This confirms a specific Congressional intent to cabin FINRA's disciplinary authority to violations of the Exchange Act.

To interpret Sections 15A and 19 as functionally equivalent despite their starkly different language would violate two fundamental principles of statutory construction: first, the notion that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted); and second, the unwavering duty of a court "to give effect, if possible, to every clause and word of a statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted).

Unsurprisingly, federal appellate decisions interpreting the scope of FINRA's statutory mandate have been sensitive to these considerations and have accorded controlling weight to the text and structure of the Exchange Act, including its discrepant grants of authority to the SEC and FINRA.  *See, e.g.*, *Fiero*, 660 F.3d at 574–77.  In *Fiero*, the Second Circuit reversed the dismissal of a federal complaint seeking a declaration that FINRA lacked statutory authority to bring judicial actions to collect disciplinary fines.  *Id.* at 573.  Of particular importance, the court contrasted the Exchange Act's grant of "express statutory authority [to] the SEC to seek judicial

---

[4] *See, e.g.*, Securities Acts Amendments of 1975, sec. 17(3), § 21(g), 89 Stat. at 155.

enforcement of penalties" with the statute's conspicuous silence respecting FINRA, and it rejected the notion that "the seemingly inexplicable nature of a gap in the FINRA enforcement scheme . . . support[ed] an inference of inadvertent omission." *Id.* at 574–76. The same reasoning applies here: Congress "was well aware of how to grant an agency" disciplinary authority over the Securities Act, *id.* at 575, and its decision not to grant FINRA such authority merits respect, especially given the internal logic of the statutory scheme, *see id.* at 576.

### 3. FINRA Rule 2010 Must Be Read in the Context of the Exchange Act's Statutory Scheme

As noted above, Sections 15A and 19 of the Exchange Act also authorize FINRA to discipline its members for violations of the organization's own rules. FINRA has taken the position that somehow the authority to enforce its own rules translates into the authority to pass rules encompassing *any* conduct, resulting in what here amounts to a general police power over the Securities Act. *See, e.g.*, *Dep't of Enf't v. Wheeler*, Disciplinary Proceeding No. 2010024320101, at *7 (FINRA OHO Feb. 26, 2013); *Dep't of Enf't v. Midas Sec., LLC*, Compl. No. 2005000075703, at *2 n.1 (FINRA NAC Mar. 3, 2011). That sweeping position is unquestionably wrong.

Although the Exchange Act's references to an association's authority to enforce its own rules may seem broad, the provision delineating the permissible scope of an association's rules presents a clear limiting principle: the rules cannot be "designed to . . . regulate by virtue of any authority conferred by this chapter matters not related to *the purposes of this chapter* or the administration of the association." 15 U.S.C. § 78o-3(b)(6) (emphasis added).[5]

20

To Plaintiffs' knowledge, no judicial or SEC opinion has ever addressed the statutory analysis articulated here.  While some cases have assumed FINRA's jurisdiction in similar circumstances, the specific issue Plaintiffs present has never been addressed;[6] to the contrary, one of the primary cases upon which FINRA has relied to support its flawed position pre-dated the 1975 amendments to the Exchange Act that named the SEC the only regulatory body with disciplinary authority over the Securities Act.  *See Mgmt. Fin., Inc.*, Exchange Act Release No. 12098, at *1 (Feb. 11, 1976) (resolving the appeal of an NASD disciplinary action initiated in 1974 and citing SEC decisions from 1962 to 1971).

In fact, a review of FINRA administrative adjudications reveals the actual purpose of FINRA Rule 2010: it enables FINRA to address generally "unethical" conduct that either (i) is rooted in violations of the Exchange Act or (ii) otherwise would not be subject to securities-industry regulatory oversight.  *See, e.g., Keilen Dimone Wiley*, Exchange Act Release No. 76558

---

[5] Notably, Plaintiffs have identified no FINRA rule prohibiting violations of "the securities laws" or any similarly expansive construction.  It strains credulity to suppose that FINRA would elect to charge Section 5 violations through Rule 2010 if another FINRA rule were directly applicable.

[6] Although several federal decisions have upheld FINRA sanctions predicated on Section 5 violations, these cases have not decided the question presented here—namely, whether FINRA's disciplinary authority reasonably may be interpreted to reach the Securities Act despite the unequivocal textual limitations in the Exchange Act.  *See World Trade Fin. Corp. v. SEC*, 739 F.3d 1243 (9th Cir. 2014) (no jurisdictional ruling); *Kunz v. SEC*, 64 F. App'x 659 (10th Cir. 2003) (same); *Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982) (rejecting a vagueness challenge to Rule 2010). The same is true of the SEC's adjudications, which uniformly lack statutory analysis and rely on inapposite case law.  *See, e.g., ACAP Fin., Inc.*, Exchange Act Release No. 70046, at *10 (July 26, 2013) ("In the FINRA proceeding, ACAP conceded that it engaged in unregistered sales of Greyfield securities in violation of Securities Act Section 5 and, in so doing, violated NASD Conduct Rule 2110.  We find that the record amply supports ACAP's concessions and accordingly affirm FINRA's finding of violation." (footnote omitted)); *Midas Sec., LLC*, Exchange Act Release No. 66200, at *19 n.63 (Jan. 20, 2012) ("A violation of Securities Act Section 5 also violates NASD Rule 2110."). According to Plaintiffs' research, the only modern SEC opinion that contains any discussion of the relationship between Section 5 and Rule 2010 confines its analysis to a single sentence and bases its holding on two SEC cases that treat violations of NASD Rule 3040—an NASD conduct rule prohibiting an employee from engaging in private securities transactions without notice to his or her employer—as the predicate for the ethical infraction.  *See Alvin W. Gebhart, Jr.*, Exchange Act Release No. 53136, at *24 n.75 (Jan. 19, 2006) (citing *Frank Thomas Devine*, Exchange Act Release No. 46746, 78 SEC Docket 2528, 2538 n.30 (Oct. 30, 2002); *Stephen J. Gluckman*, Exchange Act Release No. 41628, 54 S.E.C. 175, 185 (July 20, 1999)).

(Dec. 4, 2015) (converting firm funds); *Blair Alexander West*, Exchange Act Release No. 74030 (Jan. 9, 2015) (misusing customer funds); *Dep't of Enf't v. Shvarts*, Compl. No. CAF980029 (NASD NAC June 2, 2000) (failing to pay attorney's fees in contempt of court); *Daniel Joseph Alderman*, Exchange Act Release No. 35997 (July 20, 1995) (wrongfully withholding client funds); *Timothy L. Burkes*, Exchange Act Release No. 32142 (Apr. 14, 1993) (converting firm property and falsifying commission-account entries).  Indeed, scholarly commentary has long cast doubt on FINRA's position.[7]

FINRA's functionally limitless interpretation of Rule 2010 cannot be reconciled with the current text and structure of the Exchange Act.  Concluding that Rule 2010 enables FINRA to unilaterally grant itself authority to police all aspects of the federal securities laws would nullify the jurisdictional limits set forth in the Exchange Act and disrupt the clear restraints that Congress has imposed on FINRA's authority in the regulation of securities markets.  *Cf. Fiero*, 660 F.3d at 574–77.

### 4.   *FINRA's Enabling Legislation Is Subject to a Strict Construction*

In addition to respecting the statutory text, Plaintiffs' interpretation of the Exchange Act also conforms to the "general rule" that an administrative agency's enabling statute must be strictly construed.  3 Norman J. Singer et al., *Sutherland Statutes and Statutory Construction*

---

[7] Writing in 1982 about the NASD, FINRA's predecessor, two members of the SEC staff observed:

> The NASD has consistently taken the position that any violation of the Exchange Act, its rules and regulations, or any statute under the jurisdiction of the Commission may constitute a violation of [NASD Rule 2110].

> Notwithstanding NASD practice and [certain] Commission decisions, [however,] the question remains as to whether the NASD's authority to enforce, for example, the provisions of the Securities Act of 1933 is restricted by its mandate under the Exchange Act.

Lee A. Pickard & Anthony W. Djinis, *NASD Disciplinary Proceedings: Practice and Procedure*, 37 Bus. Law. 1213, 1221 & n.43 (1982).

§ 65:2 (7th ed. 2015).  This interpretive rule, which is rooted in the premise that administrative

agencies are "purely creatures of legislation without inherent or common-law powers," *id.*,

provides that "only those powers are granted which are conferred either expressly or by

necessary implication," *Walker v. Luther*, 830 F.2d 1208, 1211 (2d Cir. 1987).

      FINRA's proffered reading of the Exchange Act, and its corresponding application of

Rule 2010, completely ignores and circumvents this fundamental principle of statutory

interpretation.  Simply put, FINRA cannot use its own general ethical rule to expand its

regulatory powers beyond the scope of its enabling legislation.  *See Fed. Mar. Comm'n v.

Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973) ("[A]n agency may not bootstrap itself into an

area in which it has no jurisdiction by repeatedly violating its statutory mandate.").  As the

Supreme Court recently explained, in the context of rejecting the distinction between

"jurisdictional" and "nonjurisdictional" agency interpretations for deference purposes:

> Both [agencies'] power to act and how they are to act is authoritatively prescribed
> by Congress, so that when they act improperly, no less than when they act beyond
> their jurisdiction, what they do is ultra vires. . . . [T]he question—whether framed
> as an incorrect application of agency authority or an assertion of authority not
> conferred—is always whether the agency has gone beyond what Congress has
> permitted it to do . . . .

*City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868–69 (2013).

      Sections 15A and 19 of the Exchange Act confirm that Congress has limited FINRA's

authority to discipline its members to violations of the Exchange Act (and FINRA's own rules,

which must themselves serve the purposes of the Exchange Act).  Authority to pursue

disciplinary actions against broker-dealers and their associated persons for violations of the

Securities Act is granted only to the SEC.  Any other conclusion impermissibly conflates the

distinctive text of Sections 15A and 19 and contravenes settled rules of statutory construction.

23

>    5.   *FINRA Cannot Develop a Fair and Adequate Factual Record on Section 5 Issues Because FINRA Has No Jurisdiction Over Corporate Issuers*

Moreover, the notion that Congress has denied FINRA the authority to enforce the Securities Act has a logical explanation: the Securities Act concerns issuances of securities, and FINRA lacks jurisdiction over corporate issuers. *See Self-Regulatory Organizations*, Exchange Act Release No. 62434, 75 Fed. Reg. 39603, 39604 (July 1, 2010) (observing that FINRA "maintains no formal relationship with, or direct jurisdiction over, issuers" and recognizing "FINRA's lack of privity with issuers of OTC Securities"). The capacity to fully develop a record as to whether a securities distribution satisfied Section 5 and its numerous exemptions thus depends on substantial amounts of information that FINRA has no power to collect. In contrast, the SEC can collect such information through its expansive governmental subpoena powers. Accordingly, FINRA cannot be expected to generate a fulsome factual record and conduct a fair and adequate hearing on Section 5 issues. As a result, Plaintiffs' argument is consistent with both the plain text of the Exchange Act and common sense.

> **B.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**

Without injunctive relief, Plaintiffs will sustain irreparable harm for three reasons: first, subjecting Plaintiffs to an ultra vires proceeding is per se irreparable harm; second, regardless of the outcome of the disciplinary hearing on its merits, Plaintiffs will suffer damages they cannot recover; and third, FINRA contends that it has immunity from private damages suits connected with the discharge of its regulatory duties.

       1.  *Subjecting Plaintiffs to an Ultra Vires Proceeding Necessarily Causes Irreparable Harm*

The very act of subjecting Plaintiffs to an ultra vires proceeding causes irreparable harm. Being compelled to endure a prosecutorial-style hearing, followed by, if necessary, multiple levels of administrative review prior to seeking a judicial determination that those very prosecutions exceeded the bounds of FINRA's jurisdiction, will result in an injury that is complete and irreparable. *See, e.g.*, *Cont'l Can Co.*, 603 F.2d at 597 (observing that "[i]f Continental is forced to defend the numerous prosecutions on the merits before the Commission prior to seeking a juridical determination that the prosecutions were unwarranted, the injury will have already been complete and uncorrectable"). Plaintiffs' requested relief would also be rendered moot, as "an action taken by an agency lacking jurisdiction is a nullity," *Boothby*, 16 F.3d at 21 n.1, and a court of appeals cannot enjoin a proceeding that has already occurred, *see, e.g.*, *Martin–Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.").

       2.  *Irreparable Harm Will Result Regardless of the Outcome of the Hearing*

No matter the outcome of the FINRA hearing, Plaintiffs will suffer significant and irreparable harm. If FINRA prevails, the resulting damages to Plaintiffs would be catastrophic and would defy monetization. For example, FINRA seeks sanctions including limits on the individual Plaintiffs' ability to associate with broker-dealers and to work in the securities industry, Ex. B at 42 (citing FINRA R. 8310(a)), and there is no guarantee that any such sanctions would be stayed during the entirely of the numerous levels of appeal that precede federal judicial review, *see* 15 U.S.C. §§ 78s(d)(2), 78y(c)(2) (granting the SEC and the court of appeals, respectively, the discretion to stay a disciplinary sanction pending appeal). Nor, for that

matter, is there a mechanism to restore Plaintiffs' damaged reputations and the resulting loss of business caused by FINRA's actions. As SCA's current president has explained, "The[] harms [associated with FINRA penalties], and particularly the loss of goodwill . . . would be irreparable given that, once a finding of liability is made by FINRA, there is no way to turn back time and erase such a finding in the minds of the public." Ex. A ¶ 18.

Conversely, if Plaintiffs succeed on the merits in the FINRA hearing, FINRA's ultra vires conduct will evade review altogether. This deprives Plaintiffs of any remedy for the harm caused by the hearing, including the expenditure of legal fees—estimated to be "in the hundreds of thousands of dollars" and likely not recoverable under FINRA rules—and the disruption caused to SCA's business by requiring multiple key officers to spend two weeks in an inconvenient, out-of-state forum to participate in an unlawful proceeding. Ex. A ¶ 17.

> 3. *FINRA's Potential Claim of Absolute Immunity from Suit Could Foreclose the Possibility of Any Later Recovery by Plaintiffs*

FINRA and its predecessor have argued in courts, with some success, that SROs are immune from damages in connection with the conduct of their regulatory responsibilities. *See, e.g.*, *Standard Inv. Chartered, Inc., v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) ("There is no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities."). Consequently, if Plaintiffs ultimately prevail on their jurisdictional argument through the administrative appeals process, there is a real risk that Plaintiffs will be unable to recover any damages from FINRA for the significant harm inflicted upon them. *See* Ex. A ¶ 17.

**C.      The Balance of Equities and the Public Interest Strongly Favor Plaintiffs**

When evaluating whether to issue an injunction, courts consider the effect on each party of granting or denying the requested relief.  *Winter*, 555 U.S. at 24.  Here, the balance of equities heavily favors granting Plaintiffs' motion.

At the outset, as explained, Plaintiffs will suffer significant and irreparable harm if they are denied injunctive relief.  By contrast, FINRA will suffer no harm from an injunction that, by definition, restricts FINRA to its appropriate statutory role.  If Plaintiffs' motion is denied, then essentially only two possibilities remain: first, Plaintiffs prevail at FINRA's hearing, which leaves them with no further recourse and harms the public and investors by leaving FINRA's authority unsettled; or second, FINRA prevails at its own hearing, which results in multiple levels of administrative appeal before the parties appear in federal court to address this same question.  And when Plaintiffs ultimately prevail on the jurisdictional issue, there will be no way to turn back the clock and pretend as though the ultra vires proceeding, no less the subsequent appeals, never happened.  There is no avenue for obtaining meaningful relief at that point.  Thus, injunctive relief is critical for Plaintiffs and does nothing to FINRA other than, at worst, delaying proceedings that lack a statutory basis and are therefore void, *Boothby* 16 F.3d at 21 n.1.

Lastly, the public and investors will not be harmed by injunctive relief.  To the contrary, they will benefit from the speedy judicial determination of the limits of FINRA's ability to enforce statutes beyond its enabling legislation.  A decision that announces the extent of FINRA's powers will also serve the broker-dealers and investors who are subject to, and affected by, FINRA's authority.

As a corollary, the absence of harm to FINRA also obviates the need for a bond under Federal Rule of Civil Procedure 65.  Although Rule 65 provides that "a court may issue a preliminary injunction . . . only if the movant gives security," Fed. R. Civ. P. 65(c), the district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 331-32 (4th Cir. 2013).  Because "[t]he amount of the bond . . . ordinarily depends on the gravity of the potential harm to the enjoined party," a nominal bond—or no bond at all—is permissible if "the risk of harm is remote" or there is no evidence regarding the likelihood of harm.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974) (approving the district court's decision to fix a bond amount at zero in the absence of evidence of harm)).  In light of the foregoing discussion, which establishes the complete want of harm to FINRA from an injunction pending a declaration of its jurisdiction, no bond is required here.

## CONCLUSION

For all of the reasons set forth above, Plaintiffs respectfully request that this Court grant a preliminary and permanent injunction restraining and enjoining FINRA from continuing the disciplinary proceeding in FINRA Case No. 2014041724601

Dated: March 22, 2016                          Respectfully submitted,

                                               /s/ Matthew H. Kirtland

                                               _____
                                               Matthew H. Kirtland (Bar No. 26089)
                                               NORTON ROSE FULBRIGHT US LLP
                                               799 9th Street NW, Suite 1000
                                               Washington, D.C. 20001-4501
                                               Telephone: (202) 662-0200
                                               Facsimile: (202) 662-4643
                                               matthew.kirtland@nortonrosefulbright.com

                                               Of Counsel:
                                               Kevin Harnisch
                                               Vijay Rao
                                               NORTON ROSE FULBRIGHT US LLP
                                               799 9th Street NW, Suite 1000
                                               Washington, D.C. 20001-4501

                                               Ryan Meltzer
                                               NORTON ROSE FULBRIGHT US LLP
                                               98 San Jacinto Blvd., Suite 1100
                                               Austin, TX 78701

                                               *Attorneys for Plaintiffs Scottsdale Capital Advisors Corporation, John J. Hurry, Timothy B. DiBlasi, and D. Michael Cruz*