**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **SCOTTSDALE CAPITAL ADVISORS CORPORATION, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No. <u>8:16-cv-860</u>**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**EXHIBIT B – FINRA Complaint**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
<u>FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION</u>**

**FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA)**
**NOTICE OF COMPLAINT**

Disciplinary Proceeding No. 2014041724601
Date:  May 15, 2015

TO:        Kevin J. Harnisch, Esq.
           Steptoe & Johnson LLP
           1330 Connecticut Avenue, NW
           Washington, DC  20036

           (Counsel for Respondents Scottsdale
           Capital Advisors Corporation, John
           J. Hurry, Timothy B. DiBlasi and D.
           Michael Cruz)

FROM:      FINRA District No. 8
           Department of Enforcement
           55 West Monroe St., Suite 2600
           Chicago, IL 60603

You are notified that a Complaint has been issued by the Department of Enforcement, a copy of which is attached, alleging that Scottsdale Capital Advisors Corporation, John J. Hurry, Timothy B. DiBlasi and D. Michael Cruz ("Respondents") have violated certain FINRA Rules and NASD Rules.

All individual Respondents named in this proceeding are reminded of the requirement to update immediately their Uniform Application for Securities Industry Registration or Transfer (Form U4) upon receipt of this Notice of Complaint to reflect that they have been named a Respondent in this Complaint. Any firm named in this proceeding is reminded of the requirement to update immediately its Uniform Application for Broker-Dealer Registration (Form BD) upon receipt of this Notice of Complaint to reflect that it has been named a Respondent in this Complaint.  In

addition, you are required during the pendency of this proceeding to notify immediately this office and the Office of Hearing Officers, in writing, of any change in your address.

ANSWER:  Pursuant to Rules 9215 and 9138 of FINRA's Code of Procedure, you are required within 28 days after the date of mailing, i.e., no later than **June 12, 2015**, to answer this Complaint, in the manner and form described by FINRA Rule 9215, and to serve your Answer to the Complaint on all other parties pursuant to FINRA Rule 9133.  Service of your Answer to the Department of Enforcement should be made to Dean M. Jeske, Deputy Regional Chief Counsel, at the address referenced above.  At the time of such service upon all parties, you are also required to file the signed original and one copy of your Answer with the Office of Hearing Officers pursuant to FINRA Rules 9135, 9136, and 9137.  Filing of your Answer with the Office of Hearing Officers should be directed to the Office of Hearing Officers, FINRA, 1735 K Street, N.W., 2nd Floor, Washington, D.C. 20006, telephone (202) 728-8008, or you may file your Answer electronically:  OHOCaseFilings@finra.org.  Papers are deemed timely filed with the Office of Hearing Officers if received by the Office of Hearing Officers within the specified time period.

The Answer must admit, deny or state that Respondents do not have or are unable to obtain sufficient information to admit or deny each allegation in the Complaint.  Any affirmative defense must be stated in the Answer.  Pursuant to FINRA Rule 9215(c), if you file a motion for a more definite statement, it must accompany your Answer.

Pursuant to FINRA Rule 9221, your Answer must specifically state whether Respondents request a hearing on the allegations of the Complaint or whether they waive a hearing.  The Office of Hearing Officers will later notify you of the hearing date and location.  If Respondents waive a hearing, a hearing may nevertheless be ordered pursuant to FINRA Rule 9221(b) or (c).  If no hearing is ordered, the Office of Hearing Officers will notify you concerning your opportunity to submit documentary evidence for consideration.

If the Complaint alleges at least one cause of action involving a violation of a statute or rule described in FINRA Rule 9120(u) relating to the quotation of securities, execution of transactions, reporting of transactions or other specified trading practice rules, you may propose that the Chief Hearing Officer select one of the panelists for your hearing from the Market Regulation Committee.

INSPECTION AND COPYING OF DOCUMENTS IN POSSESSION OF STAFF:  You are hereby advised that, pursuant to FINRA Rule 9251, unless otherwise provided, no later than 21 days after the filing date of your Answer (or, if there are multiple Respondents, not later than 21 days after the filing of the last timely Answer), the Department of Enforcement shall commence making available for inspection and copying by any Respondent, certain documents prepared or obtained by the Department of Enforcement in connection with the investigation leading to the institution of these proceedings.  In that regard, contact Dean M. Jeske at (312) 899-4353 to make arrangements.  Please note that a Respondent shall not be given custody of the documents or be permitted to remove them from the offices of FINRA.  However, a Respondent may obtain

a photocopy of any documents made available for inspection; the Respondent shall pay the cost of any such copying of documents.

OFFER OF SETTLEMENT:  Pursuant to FINRA Rule 9270, you may propose a written Offer of Settlement at any time.  You may obtain the required format from the above-named staff attorney.  Discussions with the staff concerning possible settlement or the submission of an Offer do not relieve you of the obligation to timely file an Answer to the charges.

PRIMARY DISTRICT COMMITTEE:  The Department of Enforcement has proposed District No. 2 as the Primary District Committee for this proceeding.  You may propose the same or another District as the Primary District Committee for this proceeding, with the filing of your Answer.   The Office of Hearing Officers will designate, pursuant to FINRA Rule 9232(c), the Primary District Committee.

PROPOSED HEARING LOCATION:  The Department of Enforcement has proposed Los Angeles, California as the appropriate location for any hearing in this proceeding.  Pursuant to FINRA Rule 9221, you may propose an appropriate location for any hearing, with the filing of your Answer.  The assigned Hearing Officer will designate, pursuant to FINRA Rule 9221(d), the location of any hearing.

REPRESENTATION:  Pursuant to FINRA Rule 9141, any Respondent may be represented by an attorney.  Alternatively, an individual may appear on his own behalf; a member of a partnership

may represent the entity; and a bona fide officer of a corporation, trust or association may

represent the entity.


NOTICE OF APPEARANCE:  You are advised that the Department of Enforcement is

represented in this matter by:

Dean M. Jeske, Deputy Regional Chief Counsel
FINRA Department of Enforcement
55 West Monroe Street, Suite. 2600
Chicago, IL 60603
Phone: 312-899-4353
Email: dean.jeske@finra.org

Michael Gross, Senior Litigation Counsel
FINRA Department of Enforcement
5200 Town Center Circle, Suite 200
Boca Center Tower 1
Boca Raton, FL 33486
Phone: 561-443-8125
Email: Michael.Gross@finra.org

Aimee Williams-Ramey, Regional Chief Counsel
FINRA Department of Enforcement
300 S. Grand Avenue, Suite 1600
Los Angeles, CA 90071
Phone:  213-613-2616
Email: aimee.williams-ramey@finra.org

Laura Blackston, Senior Regional Counsel
FINRA Department of Enforcement
1100 Poydras Street, Suite 850
New Orleans, LA 70163
Phone: 504-412-2408
Email: Laura.Blackston@finra.org

Heather Freiburger, Principal Regional Counsel
FINRA Department of Enforcement
55 West Monroe St., Ste. 2600
Chicago, IL 60603
Phone: 312-899-4334
Email: Heather.Freiburger@finra.org

GOVERNING RULES: You are directed to FINRA Rule 9000, et seq.,

http://finra.complinet.com, for additional pertinent rules governing these proceedings.

Dean M. Jeske
Deputy Regional Chief Counsel


Enclosure: Complaint and Schedules A-C

### FINANCIAL INDUSTRY REGULATORY AUTHORITY
### OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT,<br><br>        Complainant,<br><br> v.<br><br>SCOTTSDALE CAPITAL ADVISORS<br>CORPORATION<br>(CRD No. 118786),<br><br>JOHN J. HURRY<br>(CRD No. 2146449),<br><br>TIMOTHY B. DIBLASI<br>(CRD No. 4623652),<br><br>and<br><br>D. MICHAEL CRUZ<br>(CRD No. 2450344),<br><br>        Respondents. | DISCIPLINARY PROCEEDING<br>No. 2014041724601 |

### COMPLAINT

The Department of Enforcement alleges:

### SUMMARY

1.　　Between December 1, 2013 and June 30, 2014 (the "Relevant Period"), Scottsdale Capital Advisors Corporation ("Scottsdale" or the "Firm") liquidated over 74 million shares of three microcap stocks—Neuro-Hitech Inc. ("NHPI"), Voip Pal.com ("VPLM"), and Orofino Gold Corp. ("ORFG")—that customer CSCT deposited into its account at the Firm.  The shares were not registered with the SEC, nor were the sales exempt from registration.  From the illegal sales, CSCT generated over $1.7 million in proceeds for its customers.

2.　　John J. Hurry, through his ownership and control of CSCT, a Cayman Islands broker-dealer, was a necessary participant and substantial factor in the violative sales.  CSCT,

through Hurry's direction, became a customer of Scottsdale, established accounts and subaccounts for its customers on whose behalf CSCT deposited over 650 million shares of microcap stocks, and liquidated nearly 145 million shares, generating proceeds of approximately $5.5 million.

3.      Hurry established CSCT in the Cayman Islands to make it an attractive intermediary for individuals engaged in the high-risk microcap stock liquidation business through foreign financial institutions.  Given its location, CSCT's securities business was not subject to regulation by the Cayman Islands and could benefit from Cayman Islands' secrecy laws that shielded its customers' identities from disclosure.  By allowing individuals to run their microcap stock liquidation business through CSCT and then through Scottsdale and its clearing firm, Alpine Securities Corporation ("Alpine")—three entities which Hurry indirectly owned and over which he could exercise control—Hurry was able to have their suspect microcap liquidations facilitated by his trio of broker-dealers, without the scrutiny that the transactions demanded.  Hurry also intentionally and unreasonably delegated supervisory responsibility for CSCT's high-risk microcap stock liquidation business to an individual who had no prior securities industry experience.  CSCT generated over $170,000 in revenue for Scottsdale during the Relevant Period.

4.      The activity in CSCT's account at Scottsdale followed a standard pattern.  A third party loaned funds to an issuer of microcap stock, and, through a series of transactions, the loan was converted to shares of stock by a foreign corporate customer of a foreign corporate customer of CSCT.  Shortly thereafter, CSCT deposited the shares, which often were in certificate form, into its account at Scottsdale for the benefit of the customer of its customer, liquidated the shares shortly after depositing them, and wired the proceeds out of its account shortly after the sales.

5.      By engaging and participating in sales of securities that were not registered with the SEC, in transactions that were not exempt from registration, Scottsdale acted in contravention of Section 5 of the Securities Act of 1933 ("Section 5"), and thus violated FINRA Rule 2010.  By being a necessary participant and substantial factor in the sales, Hurry likewise acted in contravention of Section 5, and thus violated FINRA Rule 2010.

6.      In addition, during the Relevant Period, Scottsdale, through its Chief Compliance Officer ("CCO"), Timothy B. DiBlasi, failed to establish and maintain a supervisory system, including written supervisory procedures ("WSPs"), reasonably designed to achieve compliance with Section 5 for sales of unregistered shares of microcap stocks.  The Firm's supervisory system for such sales was deficient because: (a) the WSPs provided insufficient guidance on identifying the true beneficial owners of microcap stocks sold for customers introduced through foreign financial institutions, such as CSCT; and (b) the procedures for conducting a reasonable inquiry of the circumstances surrounding deposits and sales of microcap stocks for such customers relied too heavily on information obtained from interested parties, and also failed to require that the inquiry include appropriate independent due diligence and analysis of the claimed registration exemptions.  As a result of the foregoing, Scottsdale and DiBlasi violated NASD Rule 3010(a), (b) and FINRA Rule 2010.

7.      Further, during the Relevant Period, Scottsdale, through its President/Approving Principal, D. Michael Cruz, failed to conduct reasonable inquiries into the circumstances surrounding the illegal sales of NHPI, VPLM, and ORFG stock by Scottsdale for CSCT.  Cruz performed inadequate inquiries on the claimed registration exemptions for sales of the three microcap stocks, despite the presence of numerous "red flags" suggesting that the sales were, or could be, illegal distributions of unregistered stocks.  Although Cruz collected some documents

and information on the deposits and sales, he failed to adequately and meaningfully analyze the collected documents and information—some of which were inconsistent and incomplete—and also failed to independently verify the provided information.  In reality, his collection efforts merely served to "paper the file" for the suspect microcap stock liquidation business being run through the trio of broker-dealers indirectly owned by Hurry.  As a result of the foregoing, Scottsdale and Cruz violated NASD Rule 3010(b) and FINRA Rule 2010.

## RESPONDENTS AND JURISDICTION

### Scottsdale Capital Advisors Corp.

8.      Scottsdale is a retail and institutional broker-dealer.  It is a FINRA member and has been a member since May 2002.

9.      The Firm is headquartered in Scottsdale, Arizona.  It has a single branch location and approximately 15 registered persons, all of whom work from its office in Scottsdale.

10.     Scottsdale's principal business is the deposit and liquidation of penny stocks for its customers.  During the Relevant Period, transactions involving penny stocks accounted for most of the Firm's revenue, as over 95 percent of the transactions that Scottsdale executed for its customers involved penny stocks.

11.     Under Article IV of the FINRA By-Laws, FINRA possesses jurisdiction over Scottsdale because: (a) it currently is a FINRA member; and (b) the Complaint charges it with securities-related misconduct committed while it was a FINRA member.

### John J. Hurry

12.     In June 2001, Hurry formed Scottsdale.  Hurry and his wife indirectly own the Firm through their creation of, and control over, various entities.  They receive the profits from Scottsdale through payments to a trust that they own and control.

4

13.     Hurry is a director of Scottsdale.  He has the authority to hire and fire its personnel.  Hurry also closely monitored the Firm's financials.

14.     Hurry entered the securities industry in May 1991.  He was associated with several FINRA members from May 1991 through April 2002.

15.     In January 2002, Scottsdale filed an initial Form U4 for Hurry.  In December 2012, Scottsdale filed a Form U5 for Hurry.

16.     From January 2002 through the present, Hurry has been a director of Scottsdale and has been listed in that capacity on the Schedule A of the Form BD of the Firm.  From January 2013 through the present, Hurry also has been a director of Alpine and has been listed in that capacity on the Schedule A of the Form BD of Alpine, a FINRA member that Hurry indirectly owns, which clears trades for Scottsdale.

17.     In October 2014, Scottsdale and Alpine both filed Form U4s for Hurry.  He currently is registered with FINRA through each firm in several capacities, including as a General Securities Representative ("GSR") and General Securities Principal ("GSP").

18.     Under Article V of the FINRA By-Laws, FINRA possesses jurisdiction over Hurry because: (a) he currently is associated with two FINRA members and registered with FINRA; and (b) the Complaint charges him with securities-related misconduct committed while he was a person associated with two FINRA members by virtue of being a director of both Scottsdale and Alpine.

**Timothy B. DiBlasi**

19.     DiBlasi entered the securities industry in December 2002.  He subsequently acquired Series 6, 7, 24, 27, 53, and 63 licenses.  From December 2002 through March 2012, DiBlasi was associated with a FINRA member.

20.     On April 9, 2012, Scottsdale filed a Form U4 for DiBlasi, commencing his association with it as of that day.  DiBlasi has been associated with the Firm since that day.  He currently is registered with FINRA through Scottsdale as, among other things, a GSR, GSP, Financial and Operations Principal, and Municipal Securities Principal.

21.     Under Article V of the FINRA By-Laws, FINRA possesses jurisdiction over DiBlasi because: (a) he currently is associated with a FINRA member and registered with FINRA; and (b) the Complaint charges him with securities-related misconduct committed while he was associated with a FINRA member and registered with FINRA.

### D. Michael Cruz

22.     Cruz entered the securities industry in January 1994.  He subsequently acquired Series 7, 24, and 63 licenses.  At various times from January 1994 through May 2008, Cruz was associated with four FINRA members.

23.     On May 20, 2008, Scottsdale filed a Form U4 for Cruz, commencing his association with it as of that day.  Cruz was registered with FINRA through Scottsdale as, among other things, a GSR and GSP from May 2008 through January 29, 2015, when Scottsdale filed a Form U5 for Cruz, terminating his registrations and association with the Firm as of that date.

24.     Upon information and belief, Cruz serves as the General Counsel for the holding companies that own Scottsdale and Alpine.

25.     Although Cruz is no longer registered or associated with a FINRA member, he remains subject to FINRA's jurisdiction for purposes of this proceeding, pursuant to Article V, Section 4 of FINRA's By-Laws, because: (a) the Complaint was filed within two years after the effective date of termination of Cruz's registration with Scottsdale, namely, January 29, 2015;

and (b) the Complaint charges him with securities-related misconduct committed while he was registered or associated with a FINRA member.

## FACTS COMMON TO CAUSES OF ACTION

### Hurry's Establishment of CSCT as a Haven for Microcap Stock Liquidators

26.     In 2013, Hurry established CSCT in the Cayman Islands.

27.     Hurry caused documents to be filed with the Internal Revenue Service ("IRS") to establish CSCT as a qualified intermediary—a foreign intermediary that has entered into a qualified intermediary withholding agreement with the IRS.  This status permits Scottsdale to liquidate microcap stocks for foreign financial institutions and their customers through CSCT, without obligating Scottsdale or its clearing firm, Alpine, to complete certain IRS documents.

28.     Hurry chose to establish CSCT in the Cayman Islands to make the entity an attractive intermediary for individuals engaged in the high-risk microcap stock liquidation business through foreign financial institutions.

29.     Under Cayman Islands law, CSCT is obligated to maintain the confidentiality of information regarding its customers, absent authorization from a customer or a directive from the Grand Court of the Cayman Islands, which the Court does not freely direct.

30.     Further, under Cayman Islands law, CSCT could, and did, claim exemption from certain regulation by the Cayman Islands Monetary Authority, which, among other things, regulates and supervises the country's financial services industry.  In a May 17, 2013 letter, the Cayman Islands Monetary Authority instructed CSCT that it "should not expressly or by implication represent to clients or potential clients that they are subject to regulation by the Cayman Islands Monetary Authority with respect to its securities investment business."

31.     Since its inception, CSCT, on behalf of the customers of its four customers (MS, UIS, TIS, and DC) (collectively, the "Customers of CSCT"), has deposited over 650 million shares of microcap stocks in its account at Scottsdale, and liquidated nearly 145 million of those shares, generating proceeds of approximately $5.5 million for its customers.  In total, CSCT paid over $170,000 in commissions and fees to Scottsdale in connection with all of its business at the Firm during the Relevant Period.

## Hurry's Control over CSCT

32.     In an attempt to distance himself from CSCT and its high-risk business, Hurry appointed GR—who had no securities industry experience—as the sole Director of CSCT.  This appointment allowed Hurry not only to control CSCT, but also to create the appearance that CSCT was controlled by someone else.

33.     Hurry installed GR to serve as the Director of CSCT, thereby allowing customers that Hurry directed to CSCT to deposit shares of microcap stocks with, and liquidate them through, CSCT, predominantly without being questioned by the inexperienced GR.

34.     Hurry also inadequately funded CSCT and unreasonably expected GR, who lacked basic computer skills, to establish and implement systems and procedures for CSCT.

35.     Hurry prospected for, and obtained all of, CSCT's customers.  Hurry, not GR, travelled to Central America to meet with three future CSCT customers (UIS, MS, and TIS)—two of whose activities form the basis of the Section 5 charge.

36.     Hurry maintained day-to-day control over CSCT through frequent video calls and electronic correspondence with GR and at least one other CSCT employee.

37.     Hurry requested and received frequent updates from GR regarding CSCT's stock deposits, business prospects, revenue, and expenses.

38.     Hurry approved CSCT's fee and commission schedules.

39.     Hurry had the authority to hire and fire CSCT's personnel, and he exercised that authority.

40.     Hurry and his wife indirectly are entitled to receive all of CSCT's profits.

41.     Hurry controlled CSCT.

### The "Red Flags" Raised by the Customers of CSCT

42.     Following phone calls and/or in-person meetings with Hurry, the Customers of CSCT opened accounts at CSCT.  All four entities were located either in Belize or Panama—countries of primary money laundering concern.

43.     Each of the Customers of CSCT also established subaccounts at CSCT for the benefit of their respective customers.  In total, the Customers of CSCT maintained 27 subaccounts, most of which were for entities located in Belize.

44.     Through the subaccounts, the true beneficial owners of any shares of microcap stocks deposited at, and liquidated through, Scottsdale were obscured by at least three layers—CSCT, the Customers of CSCT, and the customers of the Customers of CSCT (which may have been owned and controlled by individuals or other entities).

*CSCT Customer MS*

45.     MS, a Panamanian broker-dealer, maintained an account at CSCT, and deposited and liquidated shares of microcap stocks on behalf of its customers through CSCT's account at Scottsdale.  Some of MS's liquidations through CSCT's account at the Firm violated Section 5.

46.     Based on information available to CSCT and Scottsdale, MS appeared to operate through nominees (*i.e.*, individuals or entities whose names were provided to CSCT as the beneficial owners of MS, but who were not, in fact, the true beneficial owners of MS) to obscure

9

its true beneficial owner(s).  MS's owners (which also are referred to as subscribers in certain documents due to their purchase of MS stock through subscription agreements) were identified on account documents as CEWD and ASW.  Information publicly available on the internet identified CEWD as an attorney for a Panamanian law firm and ASW as a subscriber/owner of approximately 150 companies.

47.     In addition, after MS opened its account, CSCT received a call from someone at MS asking to journal a cleared position from Scottsdale to CSCT.  GR relayed the request to Cruz at Scottsdale, referring to "[F], the head honcho, at [MS]."  Information on MS provided by GR to Scottsdale, however, did not identify anyone with F's name as being affiliated with MS. Based upon the reference to F as MS's "head honcho," F may have been the true beneficial owner of MS.  Scottsdale did not identify or investigate this "red flag" regarding F's possible ownership of MS, and therefore could not ascertain whether the liquidations of microcap stocks for MS and its customers, including VPLM stock (discussed below), were effected by affiliates of issuers.

48.     In January 2014, MS emailed GR about MS's anticipated deposits and liquidations of thinly traded microcap stocks.  Specifically, MS wanted to know whether CSCT had volume restrictions on trading microcap stocks, whether CSCT had a limitation on the daily volume of a given stock that it could trade, and the identity of the market makers that CSCT used.  GR forwarded these questions to Cruz at Scottsdale, because GR, by his own admission, lacked the experience to answer them.

49.     On March 19, 2014, TT contacted Scottsdale and represented that he was an attorney, represented MS, and was authorized to speak to the Firm on behalf of MS.  TT asked Scottsdale to contact him regarding an urgent deposit of shares of a microcap stock.  At the time,

based on CSCT's account documents, Scottsdale was, or should have been, aware that TT was not only acting on behalf of MS, but also was listed as the Money Laundering Reporting Officer for CSCT and assisted with establishing CSCT's anti-money laundering procedures.

50.     On January 8, 2014, an MS employee sent an email to GR that identified the employee as having U.S. telephone numbers.  Because CSCT was only supposed to deal with non-U.S. citizens, this email should have raised questions about the propriety of CSCT's business for MS at or around the same time that CSCT deposited stock in its account at Scottsdale for the benefit of MS and its customers.

51.     All of these circumstances should have raised questions for Scottsdale about the propriety of CSCT's microcap stock liquidations for MS and its customers.

*CSCT Customer UIS*

52.     UIS, a broker-dealer based in Belize City, Belize, maintained an account at CSCT, and deposited and liquidated shares of microcap stocks on behalf of its customers through CSCT's account at Scottsdale.  Some of UIS's liquidations through CSCT's account at the Firm violated Section 5.

53.     UIS's publicly available website marketed its service of providing nominees for its customers to maintain confidentiality, explaining that a nominee officer or director is "an appointed person who will act as an officer or director on [the customer's] behalf, giving [the customer] an extra level of confidentiality as [the customer's] name will not show up as an officer or director . . . ."

54.     Emails provided to Scottsdale identify UIS's President as JC, but documents submitted to CSCT are signed by CC.

11

55.     In addition, CC's emails listed a U.S. telephone number for him—a "red flag" that CSCT may have been conducting business with a U.S. customer or customers.

56.     All of these circumstances should have raised questions for Scottsdale about the propriety of CSCT's microcap stock liquidations for UIS and its customers.

*CSCT CUSTOMER TIS*

57.     TIS, a broker-dealer based in Belize, maintained an account at CSCT, and deposited and liquidated shares of microcap stocks on behalf of its customers through CSCT's account at Scottsdale.

58.     Before and after becoming a CSCT customer, TIS maintained an account directly with Scottsdale from approximately August 2011 through June 2014.

59.     According to its account documents, TIS was located at an address in Belize City, Belize that was shared by over 50 subaccounts that TIS maintained at Scottsdale.  The use of the same address by such a large number of corporate account holders suggested an attempt by TIS and others to conceal the true location and ownership of the entities, thereby raising concerns about the veracity of the information provided about TIS to Scottsdale.

60.     Information contained in TIS's new account documents at CSCT, as well as other information available to Scottsdale, suggested that TIS, like CSCT's other customers and its customers' customers, may have operated through nominees to obscure its true beneficial owner(s).

61.     The new account form for TIS for its account at CSCT, which was provided to Scottsdale, identified the entity KL as the subscriber/owner of TIS.  In other documents at CSCT and Scottsdale, KL was associated with AG, an individual who was a signatory on nine

subaccounts under TIS's account at Scottsdale, as well as for another customer account of CSCT (DC).

62.     In addition, LS, who was listed on TIS's new account documents with CSCT as a witness to the execution of TIS's corporate documents, was identified as an authorized signatory on 16 subaccounts under TIS's account at Scottsdale.

63.     All of these circumstances should have raised questions for Scottsdale about the propriety of CSCT's microcap stock liquidations for TIS and its customers.

*CSCT Customer DC*

64.     DC, a broker-dealer based in Belize, maintained an account at CSCT, and deposited and liquidated shares of microcap stocks on behalf of its customers through CSCT's account at Scottsdale.

65.     Information contained in DC's new account documents, as well as other information available to Scottsdale, suggested that DC, like CSCT's other customers, may have operated through nominees to obscure its true beneficial owner(s).

66.     According to its account documents, DC shared the same address in Belize City as TIS and over 50 other subaccounts that TIS maintained at Scottsdale.

67.     KC and AK, British citizens, had trading authority over DC's account.  EDL, a Swiss entity, served as the secretary and director for DC.  HH, a Chinese citizen, also was authorized to direct activity in DC's account at CSCT.

68.     Like TIS, DC listed the entity KL as a subscriber on its corporate documents. AG, who was a signatory on nine other accounts for separate entities at Scottsdale, signed the corporate documents on behalf of KL.

69.     The numerous jurisdictions and nationalities associated with DC, the evidence of
the possible use of nominees, and the use of an address shared with over 50 other unrelated
accounts increased the risk of potential Section 5 and other securities rules violations.

* * *

70.     Despite the foregoing "red flags" that the Customers of CSCT may have operated
through nominees, Scottsdale, through DiBlasi, failed to have WSPs that adequately addressed
these risks. In addition, Scottsdale, through Cruz, also failed to identify and investigate the "red
flags" discussed above and below.

**The Sales of Unregistered Shares of NHPI Stock**

71.     NHPI, a Delaware corporation headquartered in Florida, incorporated as Northern
Way Resources, Inc. in 1995.  It originally was engaged in the oil and gas business.

72.     In January 1996, NHPI changed its state of incorporation to Delaware and its
name to Neurotech Pharmaceuticals, Inc.  One month later, it changed its name to Neuro-Hitech
Pharmaceuticals, Inc.  In August 2006, it changed its name to Neuro-Hitech, Inc.  According to
NHPI's last 10Q filing in 2009, it is a "specialty pharmaceutical company focused on
developing, marketing and distributing branded and generic pharmaceutical products primarily in
the cough and cold markets."

73.     Between September 2009 and October 2013, NHPI did not make any public
filings.  By 2014, according to information on otcmarkets.com, NHPI was transitioning from the
pharmaceutical business to the oil and gas production and exploration business, and it described
itself as "a holding company with assets currently in oil and gas and in the pharmaceutical
sector."  NHPI's Quarterly Report for the period ending September 30, 2013 disclosed that it had
total income of ($156,241) and total expenses of $314,773.

14

74.     According to the Delaware Secretary of State's website, NHPI has been "delinquent" on its taxes since March 2014.

75.     From approximately mid-February through mid-March 2014, NHPI was the subject of approximately 17 promotional newsletters and press releases, touting the corporation and its business prospects.  For example, a March 11, 2014 newsletter issued by PennyStockCrowd, entitled "Breakout Alert *NHPI* New Crowd Favorite Could Run," hyped NHPI's future as "The #1 Percentage Leader in the Whole Market over the next 2-3 days" with "a monster 200-300% Gain!"  The newsletter was a purchased advertisement.

76.     After the wave of promotional materials, NHPI's stock rose from $0.0125 per share on February 10, 2014 to a high of $0.0550 per share on March 12, 2014.  On March 17, 2014 after the promotions had subsided, the stock closed at $0.0160 per share.

77.     Between February 7, 2014 and May 7, 2014, CSCT deposited 60 million shares of NHPI stock in certificate form into its account at Scottsdale, liquidated all of the shares shortly after deposit and amidst the promotional campaign, and wired the proceeds out of its account shortly after the sales.  See Schedule A, which is attached hereto and incorporated herein, for a table detailing the deposits and sales NHPI stock.

78.     In support of its NHPI deposits, CSCT provided Scottsdale with, among other documents, a Promissory Note dated May 1, 2012, a related Note Conversion Agreement dated November 15, 2013, three Promissory Notes dated September 1, 2013, and three related Note Satisfaction Agreements dated September 16, 2013.  The documents reflect that TC, a Texas resident, loaned $10,000 to NHPI and converted 90 percent of the debt to 90 million shares of NHPI stock, which he received on November 15, 2013.

79. Given that Scottsdale's Deposited Securities Checklists indicated that there were approximately 980 million shares of NHPI stock issued and outstanding, the conversion should have raised a "red flag" because, by converting only 90 percent of the debt to 90 million shares of NHPI stock, TC avoided becoming a ten percent owner of NHPI and thereby a presumptive affiliate of NHPI.

80. Moreover, on September 1, 2013— prior to receiving his shares—TC pledged 60 million of his shares (which he did not yet own) to three Belizean entities that shared the same address (SKY, SNS, and IOS) as collateral for funds that each entity loaned to him.  Two weeks later, on September 16, 2013, the loans to TC were satisfied when each of the three entities signed a Note Satisfaction Agreement and purportedly received the invalidly pledged shares of NHPI stock.

81. Despite the invalid title to the shares, between February 7, 2014 and March 12, 2014, CSCT deposited 60 million shares of NHPI stock for the benefit of its customer (UIS) for the further benefit of UIS's customers (SKY, SNS, and IOS).

82. CSCT deposited 40 million of the shares after the State of Delaware had declared that NHPI was "delinquent" on its taxes.

83. The due diligence documents for the NHPI deposits obtained by Scottsdale are contradictory, incomplete, and inaccurate.

84. SNS and IOS used the same physical stock certificate to deposit their shares, despite the fact that the entities were purportedly owned and operated by different individuals.

85. In the due diligence packet for the deposit of 20 million shares of NHPI stock by CSCT for the benefit of UIS, for the further benefit of IOS, Alpine's Deposited Securities Request Form obtained by Scottsdale falsely identifies CSCT as the owner of the shares.  The

form, which lists "Resale" as the reason for the deposit, is signed by GR as depositor.  However, the Securities Deposit Pre-Review Request form, included in the same packet, identifies IOS as the owner of the shares.

86.     Further, CSCT's OTCBB/Pink Sheet Security Deposit Correspondent Representation Letter form for the deposit identifies JX as the "Authorized Person" for IOS, but does not include JX's title, as required by the form.  In addition, the form is signed by CC, the control person for UIS.

87.     JX signed the OTCBB/Pink Sheet Beneficial Ownership Declaration form as the beneficial owner of IOS, but his relationship with IOS is not disclosed.

88.     None of the documents obtained by Scottsdale specifically identify whether any of the officers or directors of IOS also directly or indirectly own additional shares of NHPI stock.

89.     In late February 2014, amidst the promotional campaign and coinciding appreciation in NHPI's stock price—and not long after the shares of NHPI stock had been deposited into CSCT's account at Scottsdale—CSCT, through Scottsdale, began liquidating the shares for its customer.  Between late February and early May 2014, CSCT, through Scottsdale, liquidated all 60 million shares of NHPI stock for its customer UIS, for the benefit of UIS's customers (SKY, SNS, and IOS), and wired the proceeds out of its account shortly after the sales.  The liquidations collectively generated approximately $263,000 in net proceeds.

90.     The liquidations were profitable for the customers of the customer of CSCT. SKY, SNS, and IOS collectively acquired the 60 million shares for $150,000 in September 2013, and they collectively generated approximately $263,000 in net proceeds from the sales of the shares between late February and early May 2014.

17

91.     The liquidations accounted for over 50 percent of the float, or the number of outstanding shares available for resale, during that time period.

92.     The price obtained for the shares generally ranged from approximately a fraction of a cent to three cents per share, and accounted for over 20 percent of the daily volume of NHPI stock on at least 17 days.

93.     Scottsdale has claimed that the liquidations of the NHPI shares were exempt from registration under Rule 144, based upon representations from CSCT, UIS, SKY, SNS, and IOS— all of which had an interest in the liquidations—that the acquisition dates of the shares by the three entities tacked back to May 1, 2012, when NHPI issued the Promissory Note to TC.

94.     The Rule 144 safe harbor, however, was not available to SKY, SNS, or IOS, because TC pledged the shares to those entities before he even owned them.

95.     SKY, SNS, and IOS all purportedly acquired the shares from TC on September 16, 2013.  Yet, TC did not acquire the shares until two months later on November 15, 2013. Thus, TC did not own the shares when he purportedly transferred them to SKY, SNS, and IOS. Because the transfers were invalid, the three entities cannot tack back their acquisition dates to May 1, 2012.

96.     The invalidity of the transfers and inability to tack back the acquisition dates to May 1, 2012 was apparent from the documents provided to Scottsdale.

97.     The foregoing shares of NHPI stock were not registered with the SEC.

98.     The foregoing shares of NHPI stock also were sold in transactions that were not exempt from registration with the SEC.

99.     The foregoing sales of NHPI stock were part of a plan or scheme to evade the registration requirements of Section 5.

100.     Scottsdale received over $5,000 in commissions from CSCT's sales of unregistered shares of NHPI stock.

**The Sales of Unregistered Shares of VPLM Stock**

101.     VPLM, a Nevada corporation headquartered in Washington, incorporated as All American Casting International, Inc. in 1997.  In 2004, it changed its name to VOIP MDU.com. It adopted its current name in September 2006.  According to information on otcmarkets.com, VPLM is "a technical leader in the broadband voice-over-internet protocol market with ownership and continuing development of a portfolio of leading edge Voip patents."  According to VPLM's 2013 annual report for its fiscal year ending September 30, 2013, it had revenue of $151, expenses of nearly $4 million, and an accumulated deficit of nearly $6 million.

102.     CSCT deposited 9,318,000 shares of VPLM stock in certificate form into its account at Scottsdale on February 7, 2014, liquidated a substantial number of the shares between February and June 2014, and wired over $1.4 million in proceeds out of its account shortly after the sales.  See Schedule B, which is attached hereto and incorporated herein, for a table detailing the deposit and sales of VPLM stock.

103.     In support of its VPLM deposit, CSCT provided Scottsdale with, among other documents, a Debt Settlement Agreement dated August 15, 2013 and a Stock Purchase Agreement dated August 23, 2013.  The documents reflect that: (a) LSF, which was controlled by RK, obtained the shares directly from VPLM on August 15, 2013, in settlement of debt owed by VPLM to LSF, in connection with a verbal line of credit that LSF extended to VPLM beginning in July 2010; and (b) LSF transferred the shares to VI, a Belizean corporation, on August 23, 2013—only eight days after acquiring them.

104.    The due diligence documents for the VPLM deposit obtained by Scottsdale are contradictory, incomplete, and inaccurate.

105.    In the due diligence packet for the deposit, Alpine's Deposited Securities Request Form obtained by Scottsdale falsely identifies CSCT as the owner of the shares.  The form, which lists "Resale" as the reason for the deposit, is signed by GR as depositor.  However, Scottsdale's OTCBB/Pink Sheet Security Deposit Agreement (Correspondent Account) form, included in the same packet, identifies VI as the owner of the shares.

106.    Further, Alpine's Deposited Securities Request Form provides that the "Owner" owns or controls 14,753,343 shares of VPLM, in addition to the deposit of an additional 9,318,000 shares, and has sold 6,716,750 shares within the past three months.  In total, that amounts to 30,788,093 shares of VPLM stock.  However, the Stock Purchase Agreement dated August 23, 2013 in the same packet provides that VI acquired 29,318,000 shares from LSF.  The documents do not identify where the additional shares are or were held, or when or how they were acquired.

107.    In addition, CSCT's OTCBB/Pink Sheet Security Deposit Correspondent Representation Letter form, included in the same packet, identifies VHB as the owner and managing member of VI, but the form is signed by IM, whose relationship with VI is undisclosed.

108.    None of the documents obtained by Scottsdale specifically identify whether any officers or directors of VI also directly or indirectly own additional shares of VPLM stock.

109.    On or about February 7, 2014, CSCT deposited 9,318,000 shares of VPLM stock for the benefit of MS, for the further benefit of VI, into CSCT's account at Scottsdale.

110.     Between February 20, 2014 and June 9, 2014, CSCT liquidated 7,812,500 shares of VPLM stock and wired the proceeds out of its account shortly after the sales.  The liquidations generated approximately $1.4 million in net proceeds.

111.     The price obtained for the shares generally ranged between approximately $0.14 and $0.30 per share, and accounted for over 20 percent of the daily volume of VPLM stock on at least 15 days.

112.     The liquidations of the VPLM shares were profitable for VI, which acquired 29 million shares for $240,000, and sold approximately 7.8 million of the shares six months later for $1.4 million.

113.     Scottsdale has claimed that the liquidations of the VPLM shares were exempt from registration under Rule 144, based upon representations by CSCT, MS, VI, and VPLM—all of which had an interest in the liquidations—that VI's acquisition date tacked back to July 31, 2012, when LSF had extended credit to VPLM.

114.     The Rule 144 safe harbor, however, was not available for two reasons.  First, VI could not use LSF's acquisition date, because LSF was a presumptive affiliate of VPLM by virtue of LSF's ownership of over ten percent of VPLM's outstanding shares of stock and RK's control over both VPLM and LSF.  In fact, in mid-March 2014, VPLM identified VI, LSF, and RK as "Covered Persons" under its Trading Policy, meaning that they held a direct or beneficial interest in the company or were aware of material information about it that is not generally known or available to the public, and therefore were precluded from trading its stock during its blackout period.  In early June 2014, VPLM advised Scottsdale that VI, LSF, and RK were "Covered Persons."

115.    Second, even if LSF were not an affiliate, the time between LSF's acquisition of the VPLM shares and the sale of the shares through Scottsdale was less than the requisite one-year holding period under Rule 144 due to the fact that VI could not tack back its acquisition date to the verbal line of credit, since it is not a security.

116.    Despite the fact that LSF did not acquire the shares of VPLM stock until August 15, 2013, Scottsdale and CSCT relied upon representations by VPLM that VI could tack the acquisition date back to the verbal line of credit purportedly in existence as of July 31, 2012. Neither Scottsdale nor CSCT took any steps to independently verify this assertion.

117.    The foregoing shares of VPLM stock were not registered with the SEC.

118.    The foregoing shares of VPLM stock also were sold in transactions that were not exempt from registration with the SEC.

119.    Scottsdale received approximately $24,000 in commissions from CSCT's sales of unregistered shares of VPLM stock.

**The Sales of Unregistered Shares of ORFG Stock**

120.    ORFG, a Nevada corporation headquartered in China, incorporated as SNT Cleaning, Inc. in 2005.  It originally was engaged in the business of cleaning and detailing cars and other vehicles.  In 2009, it changed its name to Orofino Gold Corp., and it entered the gold mining business.  In September 2014, after the transactions described herein, ORFG changed its name to Bakken Energy Corp., and it entered the oil and gas business.

121.    ORFG was a development stage company as of February 2013, and it deregistered with the SEC in April 2013.  ORFG's 2013 annual report for its fiscal year ending May 31, 2013 disclosed that it had minimal assets, no cash, no revenue, expenses of over $700,000, and an accumulated deficit of approximately $3.7 million.

122.    From approximately early May 2014 to late June 2014, ORFG was the subject of over 30 promotional newsletters and press releases, touting the company and its business prospects.  For example, a May 5, 2014 newsletter issued by OTCEquity promoted ORFG as its "mega play," touting that ORFG had acquired an oil refinery valued at $16.5 million, which "the company believes it is worth much more."  The newsletter further provided that "[t]o find such impressive assets on a 2 cent company is incredible," but it failed to explain how ORFG, a company without any assets and revenue, managed to finance the purchase of an oil refinery. The newsletter was a paid advertisement.

123.    Amidst the wave of promotional materials and press releases, ORFG's stock price ranged between $0.0150 and $0.0290 per share.  By July 15, 2014, the promotions had subsided, and the stock price dropped to $0.0083 per share.

124.    During the aforementioned promotional campaign, CSCT deposited 13,280,000 shares of ORFG stock in its account at Scottsdale on or about June 11, 2014, liquidated 6,403,298 of the shares by the end of the month, and wired approximately $90,000 out of its account shortly after the sales.  See Schedule C, which is attached hereto and incorporated herein, for a table detailing the deposit and sales of ORFG stock.

125.    The due diligence documents for the deposit obtained by Scottsdale are contradictory, incomplete, and inaccurate.

126.    In the due diligence packet for the deposit of 13,280,000 shares of ORFG stock by CSCT for the benefit of UIS, for the further benefit of MC, Alpine's Deposited Securities Request Form obtained by Scottsdale falsely identifies CSCT as the owner of the shares.  The form, which lists "Resale" as the reason for the deposit, is signed by GR as depositor.  However, Scottsdale's OTCBB/Pink Sheet Security Deposit Agreement (Correspondent Account) form,

included in the same packet, identifies MC as the owner of the shares.  MC shared the same address in Belize as other UIS customers, including SKY, SNS, and IOS.

127.    Further, CSCT's OTCBB/Pink Sheet Security Deposit Correspondent Representation Letter form obtained by Scottsdale identifies GM as the "Authorized Person" for MC, but does not include GM's title, as required by the form.  In addition, the form is signed by CC, the control person for UIS.

128.    GM signed the OTCBB/Pink Sheet Beneficial Ownership Declaration form as the beneficial owner, but his relationship with MC is not disclosed.

129.    None of the documents obtained by Scottsdale specifically identify whether the officers or directors of MC directly or indirectly own additional shares of ORFG stock.

130.    In support of its deposit, CSCT provided Scottsdale with, among other documents: (a) a 12% Convertible Promissory Note between ORFG and CF dated September 1, 2012 ("Original ORFG Note"); (b) an Assignment and Modification Agreement among ORFG, CF, and AM dated January 18, 2014; (c) an Eight Percent (8%) Convertible Note between ORFG and AM dated January 18, 2014 ("Modified ORFG Note"); (d) a Notice of Conversion; and (e) a Stock Purchase/Debt Payment Agreement between AM and MC dated April 16, 2014.

131.    In the Modified ORFG Note, ORFG represented "for value received [ORFG] promises to pay AM the principal sum of . . . $50,000."  The documents provided to Scottsdale further reflect that AM converted $9,000 of the debt to 15 million shares of ORFG stock, which it sold to MC between April 16 and 22, 2014.

132.    In the Stock Purchase/Debt Payment Agreement between AM and MC, a Belizean corporation, MC represented that it "agrees that security being purchased is for investment by purchaser.  Security is not being purchased for promotion of any kind by the purchasers of this

24

stock, for the company, or for the seller."  ORFG, however, was promoted by

pennystockcrowd.com, a stock promotion company linked to MC by publicly available

information.

133.    On June 11, 2014, CSCT deposited 13,280,000 shares of ORFG stock for the

benefit of UIS, for the further benefit of MC, into its account at Scottsdale.

134.    Despite its written representation that the shares were acquired for investment

purposes only, from June 11-30, 2014—approximately two months after MC had acquired the

shares of OFRG stock—CSCT liquidated 6,403,298 shares of ORFG stock for MC, amidst the

promotional campaign, and wired the proceeds out of its account shortly after the sales.  The

liquidations generated approximately $91,000 in net proceeds.

135.    The price obtained for the ORFG shares ranged between one and two cents per

share.

136.    Scottsdale has claimed that the liquidations of the ORFG shares were exempt

from registration under Rule 144, based upon representations from CSCT, UIS, MC, and

ORFG—all of which had an interest in the liquidations—that the acquisition date for the shares

tacked back to September 1, 2012, when ORFG issued the Original ORFG Note to CF.

137.    The Rule 144 safe harbor, however, was not available to MC because MC cannot

tack back to CF's acquisition date, and therefore cannot satisfy the one-year holding period

requirement of the Rule.

138.    Under the terms of the Original ORFG Note, the option to convert the debt to

shares of ORFG stock expired in September 2013.  In order to make the debt acquired by AM

convertible to stock, new consideration was exchanged by ORFG and AM in connection with the

Modified ORFG Note and related Assignment and Modification Agreement.  Specifically, the

interest rate payable by ORFG was reduced from twelve percent to eight percent, and the

Modified ORFG Note allowed for the conversion of the debt to shares of ORFG stock, an option

that had expired under the terms of the Original ORFG Note.

139.    In concluding that MC's acquisition could tack back to the Original ORFG Note,

Scottsdale and CSCT relied upon representations by the issuer, ORFG.  Neither Scottsdale nor

CSCT took any steps to independently verify the representations.

140.    The foregoing shares of ORFG stock were not registered with the SEC.

141.    The foregoing shares of ORFG stock also were sold in transactions that were not

exempt from registration with the SEC.

142.    Scottsdale received approximately $1,900 in commissions from CSCT's sales of

unregistered shares of ORFG stock.

### FIRST CAUSE OF ACTION
### UNREGISTERED SECURITIES – SALES OF
### (VIOLATIONS OF FINRA RULE 2010 BY SCOTTSDALE AND HURRY)

143.    The Department realleges and incorporates by reference paragraphs 1-142, above.

144.    Section 5 of the Securities Act of 1933 prohibits sales of securities that are not

registered with the SEC, unless the sales are exempt from registration.

145.    Section 4(a)(1) of the Securities Act exempts "transactions by any person other

than an issuer, underwriter, or dealer" from the registration requirements of Section 5.  Under

Section (2)(a)(11) of the Securities Act, the term "underwriter" is defined as "any person who

has purchased from an issuer with a view to . . . distribution of any security."  Under Section

(2)(a)(4) of the Securities Act, the term "issuer" includes persons directly or indirectly

controlling the issuer or under common control with the issuer, directly or indirectly.

Compliance with Rule 144 establishes a safe harbor against a claim that an individual or entity is an "underwriter."

146.    The Preliminary Note to Rule 144, however, provides that Rule 144 "is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the [Securities] Act."

147.    As detailed above, the Rule 144 safe harbor and the Section 4(a)(1) exemption are unavailable for the subject sales of shares of NHPI stock, and therefore could not be relied upon by Hurry and Scottsdale, because the sales were a part of a plan or scheme to evade the registration requirements of the Securities Act.

148.    Section 4(a)(4) of the Securities Act exempts "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders" from the registration requirements of Section 5.  Among other conditions a firm must meet to take advantage of the exemption under Section 4(a)(4), a firm must conduct a reasonable inquiry such that it is unaware of circumstances suggesting that the customer is an underwriter of the securities sold or that the transaction is part of an illegal, unregistered distribution of the issuer's securities.

149.    As detailed above and below, the Section 4(a)(4) exemption is unavailable to Scottsdale or Hurry because they failed to conduct reasonable inquiries of the circumstances surrounding the foregoing deposits and sales of shares of NHPI, VPLM, and ORFG stock.

150.    Scottsdale sold the foregoing shares of NHPI, VPLM, and ORFG stock for CSCT and its customers through use of the means or instruments of transportation or communication in interstate commerce and the mails, by selling the shares through the over-the-counter ("OTC")

27

market, by corresponding about the deposits and corresponding sales through the mail and email, and by communicating about them in phone calls.

151.    No registration statement has been filed with the SEC or was in effect for the foregoing shares of NHPI, VPLM, and ORFG stock, and the shares of the three stocks were sold in transactions that were not exempt from registration with the SEC.

152.    Hurry was a necessary participant and substantial factor in the foregoing sales of NHPI, VPLM, and ORFG stock as a result of his establishment, indirect ownership, management, and control of CSCT, as well as his prospecting on behalf of CSCT, and his indirect ownership of, and ability to control, Scottsdale and Alpine.

153.    Hurry's establishment of CSCT, indirect ownership of CSCT, management of CSCT's business, control over CSCT and its personnel, and prospecting for CSCT customers played a significant role in the occurrence of the violative sales of NHPI, VPLM, and ORFG stock, but for which the sales would not have occurred.

154.    It was foreseeable that CSCT, through its account at Scottsdale, would sell unregistered shares of microcap stocks in transactions that were not exempt from registration based on: (a) Hurry's establishment of CSCT as an attractive intermediary in the Cayman Islands—a country with stringent secrecy laws, which did not regulate CSCT's securities business—for individuals who, through foreign financial institutions, engaged in the high-risk microcap stock liquidation business; (b) Hurry's unreasonable delegation of responsibility to GR—who had no securities industry experience—to vet CSCT's high-risk microcap stock liquidation business for possible violations of Section 5 and other securities laws and rules; and (c) Hurry's indirect ownership of, and ability to exercise control over, CSCT, Scottsdale, and

Alpine, which facilitated liquidations of microcap stocks, without the scrutiny such transactions demanded.

155.    FINRA Rule 2010 requires members, in the conduct of their business, to "observe high standards of commercial honor and just and equitable principles of trade."

156.    By engaging and participating in the foregoing sales of unregistered securities in transactions not subject to an exemption from the registration requirements, Scottsdale acted in contravention of Section 5, and thus violated FINRA Rule 2010.

157.    By being a necessary participant and substantial factor in the foregoing sales of unregistered securities in transactions not subject to an exemption from the registration requirements, Hurry acted in contravention of Section 5, and thus violated FINRA Rule 2010.

**SECOND CAUSE OF ACTION**
**SUPERVISORY PROCEDURES—DEFICIENT SUPERVISORY SYSTEM**
**AND WRITTEN SUPERVISORY PROCEDURES**
**(VIOLATIONS OF NASD RULE 3010 AND FINRA RULE 2010  BY SCOTTSDALE AND DIBLASI)**

**Scottsdale's Supervisory Structure**

158.    The Department realleges and incorporates by reference paragraphs 1-157, above.

159.    DiBlasi became Scottsdale's CCO in October 2013.  As CCO, DiBlasi was responsible for establishing Scottsdale's supervisory procedures, including its WSPs.  In particular, according to Scottsdale's WSPs, DiBlasi was responsible for "establishing procedures reasonably designed to ensure: the stock certificate is validly issued and owned by the customer; and the resale of such security is made in reasonable reliance on an exemption from the registration requirements, as applicable."

160.    DiBlasi was responsible for establishing and maintaining a supervisory system, including WSPs, for Scottsdale reasonably designed to prevent sales of unregistered, non-exempt stocks by the Firm for its customers.

161.    Cruz became a member of Scottsdale's Management Committee and its General

Counsel in May 2008.  In March 2013, he was appointed as its President.  From at least

December 1, 2013 through June 30, 2014, Cruz was the principal at the Firm with ultimate

responsibility for approval of deposits and sales of microcap stocks by customers that were

foreign financial institutions for purposes of compliance with Section 5.

162.    Cruz was responsible for enforcing Scottsdale's WSPs to prevent sales of

unregistered, non-exempt stocks by the Firm for such customers.

163.    Scottsdale, DiBlasi, and Cruz were aware of the importance of implementing and

enforcing a reasonable supervisory system to monitor for potential Section 5 violations in

Scottsdale's high-risk microcap liquidation business, not only because that was, and still is, the

Firm's principal business, but also because FINRA had previously sanctioned the Firm for such

violations.  In November 2011, FINRA issued an order approving an Offer of Settlement of a

Complaint filed against Scottsdale and its former President.  In the Offer of Settlement,

Scottsdale: (i) consented to findings that it sold unregistered securities without the availability of

an applicable exemption and failed to implement an adequate AML compliance program; (ii)

was censured; and (iii) agreed to pay a fine of $125,000.

**Scottsdale's Inadequate Supervisory System and WSPs**

164.    During the Relevant Period, Scottsdale, through DiBlasi, failed to establish and

maintain a supervisory system, including WSPs, reasonably designed to achieve compliance with

Section 5 for the sales of unregistered microcap stocks.

165.    Scottsdale's supervisory system was inadequate to reasonably ensure that its

customers' sales of microcap stocks were sold pursuant to an effective registration statement or a

valid exemption therefrom.

166.     Specifically, Scottsdale's supervisory system was inadequate to reasonably ensure that the Firm identified the true beneficial owners of shares of microcap stocks sold into the U.S. markets for its customers.  Scottsdale's supervisory system for sales of unregistered shares of microcap stocks was deficient because its WSPs did not set forth clear responsibilities for its personnel or set forth a mandatory standardized process to conduct a reasonable inquiry regarding the beneficial ownership information in order to determine whether sales complied with the registration requirements of Section 5 or the exemptions therefrom.

167.     Further, the WSPs did not provide sufficient guidance for identifying the true beneficial owners of securities sold, with regards to customers introduced through foreign entities, including foreign financial institutions, in order to ensure compliance with Section 5.

168.     Instead, the documents gathered by Scottsdale included an OTCBB/Pink Sheet Beneficial Ownership form to be completed with each deposit.  In the form, the purported beneficial owner of the foreign entity that sought to deposit securities represented that he or she was not an insider or promoter of the issuer of those securities.  Scottsdale's WSPs, however, did not require the Firm's personnel to take steps, such as obtaining corporate records, to independently verify self-serving representations in the form.  Without requiring that a reasonable inquiry be conducted into the true beneficial owners of offshore entities, Scottsdale could not determine whether sales of the deposited microcap stocks complied with Section 5.

169.     The WSPs also did not address the use of nominees or provide guidance on "red flags" suggesting the possible use of nominees to conceal beneficial owners.

170.     The WSPs likewise did not address the use of the same officers and directors by multiple companies or the same address by multiple companies.

171.     The WSPs also never directed that a deposit and subsequent sale be cancelled where the identity of the true beneficial owner could not be confirmed.

172.     Due to this lack of clear guidance in Scottsdale's WSPs, the Firm, through DiBlasi, established inadequate unwritten procedures for conducting a reasonable inquiry.

173.     Before being superseded by FINRA Rule 3110 in December 2014, NASD Rule 3010(a) required members to "establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules."

174.     Before being superseded by FINRA Rule 3110 in December 2014, NASD Rule 3010(b) required members to "establish, maintain, and enforce written procedures to supervise the types of business in which it engages and to supervise the activities of registered representatives, registered principals, and other associated persons that are reasonably designed to achieve compliance with applicable securities laws and regulations, and with the applicable Rules of NASD."  These procedures must be tailored to the types of business in which the firm engages, and they also must set out mechanisms for ensuring compliance and detecting violations, not merely set out what conduct is prohibited.

175.     During the Relevant Period, Scottsdale, through DiBlasi, failed to establish and maintain a supervisory system, including WSPs, reasonably designed to achieve compliance with Section 5 for sales of microcap stocks.

176.     As a result of the foregoing, Scottsdale and DiBlasi violated NASD Rule 3010(a), (b) and FINRA Rule 2010.

**THIRD CAUSE OF ACTION**
**SUPERVISORY PROCEDURES—FAILURE TO SUPERVISE**
**(VIOLATIONS OF NASD RULE 3010 AND FINRA RULE 2010 BY SCOTTSDALE AND CRUZ)**

**Regulatory Notice 09-05**

177.     The Department realleges and incorporates by reference paragraphs 1-176, above.

178.     In January 2009, FINRA issued Regulatory Notice 09-05 ("RN 09-05"), entitled "Unregistered Resales of Restricted Securities."  In RN 09-05, FINRA, citing guidance issued by the SEC in 1962, reminded firms and associated persons of their obligation to determine whether securities are eligible for public sale, because "[f]irms that do not adequately supervise or manage their role in such distributions run the risk of participating in an illegal, unregistered distribution."

179.     In RN 09-05, FINRA identified ten examples of "situations in which firms should conduct a searching inquiry to comply with their regulatory obligations under the federal securities laws and FINRA rules."  The non-exhaustive, illustrative list of "red flag" situations, which also were set forth in Scottsdale's WSPs, included, among others, situations where:

   a.     A customer opens a new account and delivers physical certificates representing a large block of thinly traded or low-priced securities;

   b.     A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale;

   c.     A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security;

      d.      The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transaction in which the securities were acquired;

      e.      There is a sudden spike in investor demand for, coupled with a rising price in, a thinly traded or low-priced security;

      f.      A customer with limited or no other assets under management at the firm receives an electronic transfer or journal transactions of large amounts of low-priced, unlisted securities; and

      g.      The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies.

180.     In RN 09-05, FINRA provided guidance on conducting a reasonable inquiry and establishing supervisory procedures and controls for unregistered resales of securities.  FINRA advised that as part of the "reasonable steps" a firm must take to ensure a resale of unregistered securities is not an illegal distribution, firms should ask, at a minimum, certain questions, including: how long the customer has held the security; how the customer acquired the security; whether the customer intends to sell additional shares of the same class of securities through other means; how many shares or other units of the class are outstanding; and what the relevant trade volume is.

181.     RN 09-05 reiterated that "firms that accept delivery of large quantities of low-priced OTC securities, in either certificate form or by electronic transfer, and effect sales in these securities, should have written procedures and controls in place to prevent participation in an illegal, unregistered distribution of securities."  RN 09-05 further advised that proper supervisory

procedures should include a "mandatory standardized process" that clearly communicates each step in the review, approval, and post-approval process, clearly assigns ownership of each step in the process, and is easily accessible to the people involved in the process.

### The "Red Flags" Raised by the CSCT Account

182.    As set forth above in greater detail, the following "red flags," which are indicative of illegal sales and potentially suspicious activity, were present in the CSCT account:

a.    GR, the director of CSCT, had no prior experience in the securities industry and lacked general knowledge regarding microcap stocks;

b.    CSCT's securities business was exempt from regulation by the Cayman Islands Monetary Authority;

c.    Pursuant to the secrecy laws of the Cayman Islands, CSCT could not disclose beneficial ownership information regarding its customers, without authorization from the customers or the Cayman Court;

d.    The foregoing facts suggesting that the Customers of CSCT may have maintained nominee accounts at CSCT;

e.    In most cases, CSCT deposited physical stock certificates for the benefit of its account holders and for the further benefit of its subaccount holders, but the certificates were titled in the name of CSCT;

f.    Many of CSCT's accounts and subaccounts shared the same physical addresses in Belize and also had common officers;

g.    CSCT regularly deposited large quantities of shares of thinly traded, low-priced microcap stocks in its account; and

h.      CSCT liquidated the shares promptly after deposit and withdrew the

resulting proceeds shortly after the sales.

**The "Red Flags" Raised by CSCT's Deposits
and Liquidations of NHPI, VPLM, and ORFG Stock**

*The NHPI Deposits and Liquidations*

183.    As set forth above in greater detail, the following "red flags," which are indicative

of illegal sales of securities and potentially suspicious activity, were present in the deposits and

sales of the unregistered shares of NHPI stock:

a.      Deposits of a substantial amount of a thinly traded, low-priced microcap

stock (60 million shares) in physical certificate form immediately after

opening the account;

b.      Ambiguity surrounding the ownership of the shares raised by documents

accompanying their corresponding deposits;

c.      Deposits of recently-issued share certificates;

d.      Deposits and liquidation of all of the shares, and wiring of the proceeds

shortly thereafter;

e.      Liquidations amidst an ongoing promotional campaign and increases in

the stock's price;

f.      Prior name changes of NHPI and recent major change in its business from

pharmaceuticals to oil and gas;

g.      NHPI's delinquent corporate status with the State of Delaware when

CSCT deposited 40 million shares of the stock;

h.      NHPI's lackluster financials;

36

i.      Liquidations accounting for a large percentage of the stock's trading volume;

j.      CSCT's customers' acquisition of the stock from an individual who held approximately 90 percent of the float;

k.      Conversion of less than 100 percent of the debt held to shares in an apparent attempt to avoid being classified as a presumptive affiliate;

l.      Profitability of SKY, SNS, and IOS on their sales of NHPI stock;

m.      Sales of the 60 million shares of NHPI stock by SKY, SNS, and IOS, collectively, accounted for over 50 percent of the float;

n.      SKY's President was an authorized signor for two other accounts at Scottsdale;

o.      SKY, SNS, and IOS shared the same address in Belize;

p.      Use of the same physical NHPI stock certificate by SNS and IOS in connection with their deposits; and

q.      UIS's website offering to provide nominees for its customers.

*The VPLM Deposit and Liquidations*

184.    As set forth above in greater detail, the following "red flags," which are indicative of illegal sales of securities and potentially suspicious activity, were present in the deposits and sales of the unregistered shares of VPLM stock:

a.      Deposit of a substantial amount of a thinly traded, low-priced microcap stock (over nine million shares) in physical certificate form soon after the opening of the account;

    b.        Deposit of recently-issued share certificates from a company with little or no assets or revenues;

    c.        Deposit and liquidation of most of the shares, and wiring of the proceeds shortly thereafter;

    d.        Substantial amount of proceeds generated from the sales (approximately $1.4 million) within a short period of time;

    e.        Prior name changes of the issuer;

    f.        Liquidations accounting for a large percentage of the stock's trading volume;

    g.        Representation by VI that it had acquired the shares for investment purposes only and not with a view for resale or distribution, coupled with sale of the shares shortly after acquiring them;

    h.        VI's acquisition of its shares from LSF, which was an affiliate of VPLM;

    i.        Possible connection of MS individuals to the U.S.;

    j.        Identification of AG as a beneficial owner/control person for a number of customers of CSCT, including as the President of VI; and

    k.        Documents reflecting that the VPLM shares were issued as a result of a debt settlement that occurred less than one year prior to the liquidations.

*The ORFG Deposit and Liquidations*

185.    As set forth above in greater detail, the following "red flags," which are indicative of illegal sales of securities and potentially suspicious activity, were present in the deposits and sales of the unregistered shares of ORFG stock:

a.  Deposit of a substantial amount of a thinly traded, low-priced microcap stock (over 13 million shares) as the continuation of a pattern of similar deposits by CSCT;

b.  Deposit of recently issued shares;

c.  Deposit and liquidation of most of the shares, and wiring of the proceeds shortly after the sales;

d.  Liquidations amidst ongoing publicity or promotional campaigns;

e.  Possible ownership by MC of a promotional company that published promotional reports on ORFG;

f.  Prior name change of ORFG and the shift in its business from cleaning and detailing of vehicles, to gold mining, and to oil and gas;

g.  ORFG's lack of revenue and reported deficit of over $3 million;

h.  Liquidations accounting for a large percentage of the stock's trading volume;

i.  Representation by MC that it had acquired the shares for investment purposes only and not with a view for resale or distribution, coupled with sale of the shares shortly after acquiring them;

j.  Possible connection of UIS individuals to the U.S.;

k.  UIS's website offering to provide nominees for its customers; and

l.  Documents reflecting that new consideration was provided in exchange for the shares, thereby vitiating the claimed Rule 144 tacking argument.

## The Failure to Supervise

186.    Cruz was responsible for approval of deposits and liquidations of microcap securities by Scottsdale's foreign financial institution customers.

187.    Scottsdale, through Cruz, failed to conduct reasonable inquiries of the foregoing deposits and liquidations of shares of NHPI, VPLM, and ORFG stock, despite the presence of the foregoing "red flags" suggesting that the sales could be unregistered distributions, which therefore required reasonable inquiries to be conducted.

188.    While Scottsdale and Cruz collected some documents and information about the proposed deposits and sales of the unregistered shares of microcap stocks, they failed to adequately analyze and independently verify the collected documents and information or to identify the foregoing discrepancies and conflicts related to the documents.  In sum, their collection and verification efforts were merely cursory and allowed Scottsdale's business of liquidating unregistered shares of microcap stocks to continue.

189.    Scottsdale and Cruz unreasonably relied upon representations from their customer and other entities and persons involved in the deposits and liquidations that the depositors were not insiders, affiliates, or promoters of the issuers whose securities they deposited.

190.    Scottsdale and Cruz failed to take adequate steps to independently verify the self-serving attestations, even in the face of inconsistent information provided to Scottsdale regarding the beneficial ownership of the entities on whose behalf the Firm liquidated microcap stocks.

191.    Scottsdale and Cruz also unreasonably relied upon representations from their customer and other interested parties regarding the availability of the Rule 144 safe harbor.  They simply accepted, at face value, claims by interested parties that acquisition dates of shares of

microcap stocks could be tacked back to earlier acquisition dates, despite discrepancies in the supporting documents regarding the acquisition dates and ownership of the shares.

192.    Scottsdale and Cruz detected promotional activity surrounding the deposits and liquidations of NHPI and ORFG stocks, but failed to document the reason why they did not consider the promotional activity to be "red flags" of potentially illegal distributions.

193.    Cruz also relied on discussions with a Scottsdale registered representative, HD, in order to determine whether to approve a deposit of shares of stock in certificate form.  Cruz did not conduct a substantive review of the documents provided in connection with a deposit, despite being the principal responsible for approving the documents.  Consequently, Cruz approved the aforementioned deposits of shares of NHPI, VPLM, and ORFG stock, notwithstanding the existence of the "red flags" (detailed above) of potential violations of Section 5.

194.    Cruz's failure to reasonably supervise the sales of the aforementioned three microcap stocks resulted in numerous "red flags" going undetected and unheeded.  Scottsdale and Cruz failed to make the requisite reasonable inquiries required to detect and prevent unlawful sales of unregistered securities.

195.    In sum, Scottsdale and Cruz failed to conduct reasonable inquiries into the foregoing sales of the three microcap stocks by CSCT.

196.    As a result of the foregoing, Scottsdale and Cruz violated NASD Rule 3010(b) and FINRA Rule 2010.

## RELIEF REQUESTED

WHEREFORE, the Department respectfully requests that the Panel:

A.    make findings of fact and conclusions of law that Respondents Scottsdale, Hurry, DiBlasi, and Cruz committed the violations charged and alleged herein;

41

B.   order that one or more of the sanctions provided under FINRA Rule 8310(a) be

imposed, including but not limited to full disgorgement of any and all ill-gotten

gains by Scottsdale and/or Hurry, together with interest; and

C.   order that Respondents Scottsdale, Hurry, DiBlasi, and Cruz bear such costs of

the proceeding as are deemed fair and appropriate under the circumstances in

accordance with FINRA Rule 8330.

**FINRA DEPARTMENT OF ENFORCEMENT**

Date: May 15, 2015

Dean M. Jeske, Esq.
Deputy Regional Chief Counsel
FINRA, Department of Enforcement
55 West Monroe Street, Suite 2700
Chicago, IL 60603
(312) 899-4353; (312) 899-4600 (fax)
dean.jeske@finra.org

Michael A. Gross, Esq.
Senior Litigation Counsel
FINRA, Department of Enforcement
5200 Town Center Circle
Tower 1, Suite 200
Boca Raton, FL 33486
(561) 443-8125; (561) 443-7998 (fax)
michael.gross@finra.org

Aimee Williams-Ramey, Esq.
Regional Chief Counsel
FINRA, Department of Enforcement
300 South Grand Avenue, Suite 1600
Los Angeles, CA 90071-3126
(213) 229-2300; (213) 617-3299 (fax)
aimee.williams-ramey@finra.org

# Schedule A to Complaint

| Client | Date | Stock | Transaction | No. of Shares | Price | Commissions | Net Proceeds |
|--------|------|-------|-------------|---------------|-------|-------------|--------------|
| CSCT | 02/07/14 | NHPI | Deposit | 20,000,000 | | | |
| CSCT | 02/26/14 | NHPI | Sell | (3,000,000) | $0.0050 | $697.11 | $14,302.89 |
| CSCT | 03/04/14 | NHPI | Sell | (156,282) | $0.0059 | $75.00 | $789.06 |
| CSCT | 03/06/14 | NHPI | Sell | (1,000,000) | $0.0078 | $116.70 | $7,500.76 |
| CSCT | 03/10/14 | NHPI | Sell | (110,000) | $0.0276 | $75.00 | $2,867.53 |
| CSCT | 03/11/14 | NHPI | Sell | (587,000) | $0.0296 | $260.36 | $16,790.86 |
| CSCT | 03/12/14 | NHPI | Deposit | 40,000,000 | | | |
| CSCT | 03/12/14 | NHPI | Sell | (368,116) | $0.0297 | $164.00 | $10,559.15 |
| CSCT | 03/13/14 | NHPI | Sell | (1,244,200) | $0.0268 | $499.98 | $32,285.72 |
| CSCT | 03/14/14 | NHPI | Sell | (1,406,027) | $0.0235 | $494.57 | $31,935.76 |
| CSCT | 03/17/14 | NHPI | Sell | (500,000) | $0.0113 | $84.83 | $5,570.04 |
| CSCT | 03/17/14 | NHPI | Sell | (500,000) | $0.0113 | $84.83 | $5,439.52 |
| CSCT | 03/17/14 | NHPI | Cancel Sell | 500,000 | $0.0113 | ($84.83) | ($5,570.04) |
| CSCT | 03/20/14 | NHPI | Sell | (335,000) | $0.0109 | $75.00 | $3,472.64 |
| CSCT | 03/24/14 | NHPI | Sell | (700,000) | $0.0083 | $87.47 | $5,610.24 |
| CSCT | 03/25/14 | NHPI | Sell | (238,100) | $0.0071 | $75.00 | $1,549.10 |
| CSCT | 03/26/14 | NHPI | Sell | (620,000) | $0.0071 | $75.00 | $4,209.06 |
| CSCT | 03/27/14 | NHPI | Sell | (2,076,816) | $0.0051 | $160.12 | $10,308.65 |
| CSCT | 03/28/14 | NHPI | Sell | (3,248,600) | $0.0049 | $239.75 | $15,457.55 |
| CSCT | 03/31/14 | NHPI | Sell | (2,500,000) | $0.0050 | $187.88 | $12,103.27 |
| CSCT | 04/01/14 | NHPI | Sell | (1,166,000) | $0.0051 | $88.67 | $5,688.44 |
| CSCT | 04/02/14 | NHPI | Sell | (743,859) | $0.0042 | $75.00 | $2,978.55 |
| CSCT | 04/17/14 | NHPI | Sell | (20,000,000) | $0.0026 | $1,048.00 | $50,519.14 |
| CSCT | 05/06/14 | NHPI | Sell | (15,000,000) | $0.0015 | $462.90 | $22,288.70 |
| CSCT | 05/07/14 | NHPI | Sell | (5,000,000) | $0.0014 | $139.00 | $6,660.89 |

| | |
|---|---|
| Total No. of Shares Sold | 60,000,000 |
| Total Net Proceeds | $263,317.48 |
| Total Commissions | $5,181.34 |

# Schedule B to Complaint

| Client | Date | Stock | Transaction | No. of Shares | Price | Commissions | Net Proceeds |
|--------|------|-------|-------------|---------------|-------|-------------|--------------|
| CSCT | 02/07/14 | VPLM | Deposit | 9,318,000 | | | |
| CSCT | 02/20/14 | VPLM | Sell | (180,000) | $0.201 | $1,037.68 | $35,412.32 |
| CSCT | 02/20/14 | VPLM | Sell | (470,000) | $0.201 | $1,930.87 | $92,539.13 |
| CSCT | 02/24/14 | VPLM | Sell | (1,500,000) | $0.200 | $5,300.92 | $294,699.08 |
| CSCT | 02/27/14 | VPLM | Sell | (200,000) | $0.195 | $731.38 | $38,268.62 |
| CSCT | 02/28/14 | VPLM | Sell | (280,000) | $0.194 | $1,001.45 | $53,318.55 |
| CSCT | 03/10/14 | VPLM | Sell | (360,000) | $0.191 | $1,031.40 | $67,501.70 |
| CSCT | 03/10/14 | VPLM | Sell | (320,000) | $0.191 | $916.80 | $59,996.43 |
| CSCT | 03/12/14 | VPLM | Sell | (505,000) | $0.186 | $1,405.16 | $91,972.51 |
| CSCT | 03/12/14 | VPLM | Cancel Sell | 505,000 | $0.186 | ($1,405.16) | ($91,972.51) |
| CSCT | 03/12/14 | VPLM | Sell | (430,000) | $0.186 | $1,405.16 | $78,097.75 |
| CSCT | 03/17/14 | VPLM | Sell | (400,000) | $0.175 | $1,050.00 | $68,948.45 |
| CSCT | 03/17/14 | VPLM | Sell | (400,000) | $0.175 | $1,050.00 | $68,702.75 |
| CSCT | 03/17/14 | VPLM | Cancell Sell | 400,000 | $0.175 | ($1,050.00) | ($68,948.45) |
| CSCT | 03/26/14 | VPLM | Sell | (500,000) | $0.175 | $1,312.50 | $85,889.86 |
| CSCT | 03/28/14 | VPLM | Sell | (350,000) | $0.176 | $924.00 | $60,453.93 |
| CSCT | 03/31/14 | VPLM | Sell | (500,000) | $0.185 | $1,387.50 | $90,814.75 |
| CSCT | 05/06/14 | VPLM | Buy | 30,000 | $0.150 | $90.13 | ($4,636.48) |
| CSCT | 04/02/14 | VPLM | Sell | (350,000) | $0.170 | $892.50 | $58,385.48 |
| CSCT | 04/04/14 | VPLM | Sell | (500,000) | $0.171 | $1,282.50 | $83,919.91 |
| CSCT | 04/09/14 | VPLM | Sell | (1,000,000) | $0.172 | $2,576.25 | $168,624.25 |
| CSCT | 04/11/14 | VPLM | Sell | (200,000) | $0.171 | $513.00 | $33,540.54 |
| CSCT | 05/05/14 | VPLM | Sell | (200,000) | $0.142 | $566.00 | $27,587.67 |
| CSCT | 06/05/14 | VPLM | Sell | (100,000) | $0.148 | $295.50 | $14,433.47 |
| CSCT | 06/06/14 | VPLM | Sell | (2,500) | $0.296 | $75.00 | $623.68 |
| CSCT | 06/09/14 | VPLM | Sell | (128,448) | $0.286 | $733.70 | $35,840.31 |
| CSCT | 06/09/14 | VPLM | Cancel Sell | 128,448 | $0.286 | ($733.70) | ($35,840.31) |

| | |
|---|---|
| Total No. of Shares Sold | 7,812,500 |
| Total Net Proceeds | $1,408,173.39 |
| Total Commissions | $24,320.54 |

# Schedule C to Complaint

| Client | Date | Stock | Transaction | No. of Shares | Price | Commissions | Net Proceeds |
|--------|------|-------|-------------|---------------|-------|-------------|--------------|
| CSCT | 06/11/14 | ORFG | Deposit | 13,280,000 | | | |
| CSCT | 06/11/14 | ORFG | Sell | (500,000) | $0.0156 | $155.60 | $7,461.82 |
| CSCT | 06/12/14 | ORFG | Sell | (500,000) | $0.0144 | $144.30 | $6,916.62 |
| CSCT | 06/13/14 | ORFG | Sell | (798,400) | $0.0142 | $226.43 | $10,879.10 |
| CSCT | 06/16/14 | ORFG | Sell | (250,000) | $0.0140 | $75.00 | $3,316.87 |
| CSCT | 06/17/14 | ORFG | Sell | (244,898) | $0.0148 | $75.00 | $3,442.10 |
| CSCT | 06/23/14 | ORFG | Sell | (250,000) | $0.0158 | $78.80 | $3,756.31 |
| CSCT | 06/24/14 | ORFG | Sell | (1,050,000) | $0.0156 | $327.60 | $15,760.63 |
| CSCT | 06/27/14 | ORFG | Sell | (2,060,000) | $0.0150 | $617.59 | $29,752.23 |
| CSCT | 06/30/14 | ORFG | Sell | (750,000) | $0.0141 | $210.75 | $10,122.75 |

| | |
|---|---|
| Total No. of Shares Sold | 6,403,298 |
| Total Net Proceeds | $91,408.43 |
| Total Commissions | $1,911.07 |

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**OFFICE OF HEARING OFFICERS**

|  |  |
|---|---|
| DEPARTMENT OF ENFORCEMENT,<br><br>               Complainant,<br><br>  v.<br><br>SCOTTSDALE CAPITAL ADVISORS<br>CORPORATION<br>(CRD No. 118786),<br><br>JOHN J. HURRY<br>(CRD No. 2146449),<br><br>TIMOTHY B. DIBLASI<br>(CRD No. 4623652),<br><br>and<br><br>D. MICHAEL CRUZ<br>(CRD No. 2450344),<br><br>               Respondents. | DISCIPLINARY PROCEEDING<br>No. 2014041724601<br><br><br>Hearing Officer -<br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that on this 15th of May 2015, I caused a copy of the foregoing Notice of

Complaint, Complaint and Schedules A, B and C to be sent as follows:

| | |
|---|---|
| **Via FedEx Overnight, First Class Mail and Email to: kharnisch@steptoe.com** | **Via FedEx Overnight, First Class Mail and Email to: grussello@sidley.com** |
| Kevin J. Harnisch, Esq.<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC  20036 | Gerald J. Russello<br>Sidley Austin LLP<br>787 Seventh Ave.<br>New York, NY 10019 |
| (Counsel for Respondents Scottsdale Capital Advisors Corp., John J. Hurry, Timothy B. DiBlasi and D. Michael Cruz)) | (Counsel for Respondents Scottsdale Capital Advisors Corp., Timothy B. DiBlasi and D. Michael Cruz) |

Dept. of Enforcement v. Scottsdale Capital Corp., et al., No. 2014041724601
Certificate of Service
Page 2

**Via FedEx Overnight and Email to:**
**OHOCaseFilings@finra.org**

FINRA Office of Hearing Officers
1735 K Street, NW, 2nd Floor
Washington, DC 20006

Gloria Galvan
Litigation Paralegal Specialist
FINRA Department of Enforcement
300 South Grand Avenue, 16th Floor
Los Angeles, CA 90071