**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **SCOTTSDALE CAPITAL ADVISORS** ) | |
| **CORPORATION, et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. <u>8:16-cv-860</u>** |
| **FINANCIAL INDUSTRY** ) | |
| **REGULATORY AUTHORITY, INC.,** ) | |
| ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**EXHIBIT C – Order on Motion for Summary Disposition**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
<u>FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION</u>**

# FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT, | |
| Complainant, | Disciplinary Proceeding No. 2014041724601 |
| v. | Hearing Officer—LOM |
| SCOTTSDALE CAPITAL ADVISORS (CRD NO. 118786), | |
| JOHN HURRY (CRD NO. 2146449), | |
| TIMOTHY B. DIBLASI (CRD NO. 4623652), | |
| and | |
| D. MICHAEL CRUZ (CRD NO. 2450344), | |
| Respondents. | |

## ORDER DENYING RESPONDENTS' MOTIONS
### (1) FOR SUMMARY DISPOSITION AND
### (2) TO DISQUALIFY ENFORCEMENT COUNSEL

## I.    Introduction

FINRA's Department of Enforcement ("Enforcement") alleges that a FINRA member firm, Scottsdale Capital Advisors ("Firm") and its owner, John Hurry, violated FINRA Rule 2010.[1]  Enforcement's central allegation is that the Firm violated FINRA Rule 2010 by effecting sales of unregistered high-risk microcap stocks that were not entitled to any exemption from registration in contravention of Section 5 of the Securities Act of 1933 ("Securities Act").[2] Enforcement further alleges that Hurry took actions to evade regulatory scrutiny and enable the Firm to make the unlawful sales.  The Complaint calls the Firm's owner, Hurry, a "necessary participant" and a "substantial factor" in the unlawful transactions.

---

[1] Rule 2010 requires that members and their associated persons adhere to high standards of commercial honor and just and equitable principles of trade.

[2] 15 U.S.C. § 77e.

Enforcement also charges the Firm, its Chief Compliance Officer, Timothy B. DiBlasi, and its President, D. Michael Cruz, with supervisory violations of NASD Rule 3010 and FINRA Rule 2010. Enforcement alleges that DeBlasi failed to reasonably perform his duty to supervise the transactions and have appropriate Written Supervisory Procedures ("WSPs") in place, and that Cruz failed to reasonably respond to red flags signaling that the transactions were potentially unlawful.

This Order denies two motions made by Respondents, a summary disposition motion and a motion to disqualify Enforcement counsel.[3]

## II.    The Complaint

Enforcement alleges that Hurry set up a Cayman Islands broker-dealer identified in the Complaint as CSCT ("Cayman Securities") to conduct a microcap securities liquidation business for foreign customers. According to the Complaint, Hurry "prospected" for business on behalf of Cayman Securities and directed customers to it. All of its customers were obtained through Hurry. They would typically open an account with Cayman Securities after a telephone call or in-person meeting with him. According to the Complaint, Hurry travelled to Central America to meet with three future Cayman Securities customers, including two customers whose transactions form the basis for the charges in the Complaint. The customers of Cayman Securities were located either in Belize or Panama—countries of primary money laundering concern.

The Complaint alleges that Hurry intentionally and unreasonably delegated responsibility for establishing and implementing systems and procedures, and for review and supervision of the microcap liquidation business for Cayman Securities, to GR, who had no prior securities industry experience and lacked general knowledge regarding microcap stocks. According to the Complaint, this allowed Hurry to create the false appearance that Cayman Securities was controlled by someone else. Enforcement alleges that in fact Hurry maintained day-to-day control over Cayman Securities by video calls and electronic correspondence, and he received frequent updates regarding its stock deposits, business prospects, revenues, and expenses. Hurry had authority to hire and fire personnel at Cayman Securities, and he exercised it. He also approved Cayman Securities' fee and commission schedules. Hurry controlled Cayman Securities, and he and his wife are indirectly entitled (through a chain of entities) to receive its profits.

---

[3] Respondents filed the motions in a single document titled "Motion For Summary Disposition And Disqualification Of Counsel." The motions will be referred to separately here as the Summary Disposition Motion and the Disqualification Motion.

Enforcement filed an opposition to Respondents' Summary Disposition Motion, which is titled "Department Of Enforcement's Memorandum In Opposition To Motion For Summary Disposition" ("Summary Disposition Opposition"). Enforcement filed a separate opposition to the Disqualification Motion, which is titled "Department Of Enforcement's Opposition To Respondents' Motion For Disqualification Of Counsel" ("Disqualification Opposition").

Respondents filed a reply to the Summary Disposition Opposition titled "Respondents' Reply To Department Of Enforcement's Opposition To Respondents' Motion For Summary Disposition" ("Summary Disposition Reply").

According to the Complaint, the transactions followed a pattern. A third party loaned funds to an issuer of microcap stock, and through a series of transactions, the loan was converted to shares of issuer stock. Shortly afterward, through Cayman Securities, the unregistered microcap shares were deposited with the Firm, usually in the form of stock certificates. After deposit, Cayman Securities promptly liquidated large blocks of the thinly traded shares and wired the proceeds out of its account at the Firm.

Enforcement alleges that the circumstances raised a number of red flags that suggested that the sales were unlawful. Consequently, the Firm was required to make further inquiry to determine the true beneficial ownership of the shares. True beneficial ownership of the shares being offered for sale was obscured, however, through layers of entities. The Firm received the shares from Cayman Securities. Cayman Securities received the shares from its customers, foreign broker-dealers. The foreign broker-dealers maintained subaccounts at Cayman Securities on behalf of their customers, and some of the foreign broker-dealers further shielded the true ownership of the shares by using nominees. Some customers shared the same nominees and addresses.

Enforcement's underlying premise is that unless the Firm knew the identity of the true beneficial owners of the shares, it could not determine whether they were insiders or were otherwise restricted from selling the securities. Enforcement alleges that the Firm failed to make the requisite reasonable inquiries to detect and prevent the unlawful sales of unregistered securities. Instead, the Firm relied on Cayman Securities and did not independently verify information regarding the true beneficial owners of the securities. As a result, the Firm had no reasonable basis for believing that the liquidation of the microcap shares without registration was lawful.

On the basis of these allegations, Enforcement charges in the First Cause of Action that the Firm and Hurry violated FINRA Rule 2010. The Firm sold unregistered stock in contravention of Section 5 of the Securities Act, and Hurry was a "necessary participant" and "substantial factor" in the unlawful sales.

In the Second Cause of Action, Enforcement charges that the Firm and its Chief Compliance Officer, DiBlasi, violated FINRA Rule 2010 and NASD Rule 3010 by failing to establish and maintain a supervisory system reasonably designed to achieve compliance with the law regarding sales of unregistered shares of microcap stocks. That failure to establish and maintain a reasonable supervisory system included a failure to have in place adequate WSPs. According to the Complaint, the WSPs did not provide sufficient guidance on identifying the true beneficial owners of microcap stocks sold for customers introduced through foreign financial institutions, such as Cayman Securities. The WSPs did not establish procedures for conducting a reasonable inquiry into the circumstances surrounding deposits and sales of such securities. The Firm relied instead on information obtained from interested parties. As a consequence, the Firm failed to require appropriate independent due diligence and analysis of the claimed registration exemptions.

Enforcement more specifically alleges that the Firm's WSPs did not address the use of nominees or the use of the same address and same officers and directors by multiple companies. These were red flags requiring further investigation into whether the true beneficial owners of the securities were insiders or promoters of the issuers of the securities. The WSPs not only failed to provide sufficient guidance for identifying the true beneficial owners of the securities being sold, but they failed to provide for the cancellation of a transaction where the identity of the true beneficial owner could not be confirmed.

In the Third Cause of Action, Enforcement charges the Firm and its President, Cruz, with violating FINRA Rule 2010 and NASD Rule 3010 by failing to respond appropriately to red flags indicating that the liquidation of the microcap stocks without registration might be illegal. The Complaint alleges that the circumstances in which the stocks of the three issuers were deposited and sold raised many of the same red flags identified in regulatory guidance more than fifty years ago as triggering a need "to conduct a searching inquiry." Those red flags signified a high risk of participating in an unlawful unregistered distribution of restricted securities. The Firm and Cruz failed, however, to adequately analyze and independently verify the information they received in connection with the deposits of unregistered shares of microcap stocks. Instead, they ignored inconsistencies in the documents and merely relied upon representations by parties who were interested in the transactions.

According to the Complaint, the transactions at issue involved the liquidation of 74 million unregistered shares of stock of three issuers in seven months. The transactions generated more than $1.7 million in proceeds.

## III.   Discussion Of Summary Disposition Motion

Respondents' Summary Disposition Motion contains two independent parts.

*First*, all Respondents argue that the proceeding exceeds FINRA's statutory authority under the Securities Exchange Act of 1934 ("Exchange Act").[4] According to Respondents, FINRA's jurisdiction is limited by the Exchange Act to enforcement of the Exchange Act and its rules and regulations. Because sales of unregistered non-exempt securities are unlawful under the Securities Act, not the Exchange Act, Respondents argue that FINRA has no jurisdiction to bring the present proceeding.

*Second*, Respondents Hurry and DiBlasi separately argue that the undisputed facts preclude finding either of them liable. They assert that they cannot be held liable for an unlawful sale of unregistered securities unless they participated in "critical aspects" of the sale, and, according to Respondents, they did not participate in "critical aspects" of the sales at issue.[5] For purposes of the Summary Disposition Motion, Hurry and DiBlasi do not appear to dispute the allegation that the transactions at issue were unlawful under Section 5 of the Securities Act. They merely assert that they were not responsible.

---

[4] 15 U.S.C. § 78 *et seq.*

[5] Summary Disposition Motion at 2-3.  Cruz and the Firm raise only the jurisdictional argument.  The proceeding would go forward as to them regardless of the resolution of the second argument.

Respondents' arguments are without merit.  For the reasons discussed below, their Summary Disposition Motion is denied in its entirety.

### A.   FINRA Has Jurisdiction To Bring This Proceeding

#### (1)   Respondents Argue That FINRA Lacks Jurisdiction To Discipline Members And Associated Persons For Violations Of Any Securities Laws Except The Exchange Act

Respondents argue that FINRA has no jurisdiction to bring this proceeding because the charges under Rule 2010 relate to transactions alleged to be in contravention of Section 5 of the Securities Act, and not a violation of the Exchange Act.  Their argument is based on Section 15A of the Exchange Act.[6]  Section 15A sets forth the terms and conditions under which FINRA can exercise its disciplinary authority.  The provision requires FINRA to exercise disciplinary authority over its members and their associated persons.

Respondents particularly rely on language contained in Section 15A(h).  Section 15A(h) requires that any FINRA decision imposing a sanction contain a statement setting forth, among other things, "the specific provision of this chapter, the rules or regulations thereunder, … or the rules of the association which any such act or practice, or omission to act, is deemed to violate."  The reference to "this chapter" is a reference to the Exchange Act.  The Securities Act occupies a different chapter of the U.S. Code.  For that reason, Respondents conclude that FINRA is not empowered to discipline its members for a violation of the Securities Act.[7]

Respondents maintain that the Exchange Act grants the SEC *exclusive* authority to enforce the Securities Act.[8]  For this proposition, they rely on Section 19(h) of the Exchange Act.  It specifies that the SEC may impose discipline where it finds that an associated person of a FINRA member has "willfully violated" the Securities Act or other specified securities laws or has effected a transaction for another when he or she had reason to believe that the transaction violated the specified securities laws.[9]  Respondents argue that Congress here expressly granted the SEC authority to enforce the Securities Act and that Congress could have done the same, but did not, with FINRA.  In particular, they emphasize that Section 19(h) specifically identifies the Securities Act by name as one of the statutes that the SEC may enforce.  In contrast, Respondents point out that the provision creating FINRA's enforcement authority only identifies the Exchange Act by name.[10]

---

[6] 15 U.S.C. § 78o-3.

[7] Summary Disposition Motion at 1-2, 6-7.  Respondents note that other sections of the Exchange Act contain the same language regarding FINRA's capacity to enforce compliance with "this chapter" and rules and regulations promulgated under it, along with FINRA's own rules.  *See* Sections 15A(b)(2) and (b)(7).

[8] Summary Disposition Motion at 9-12; Summary Disposition Reply at 2-3.

[9] 15 U.S.C. § 78s(h).

[10] Summary Disposition Motion at 9-12; Summary Disposition Reply at 5.

Accordingly, Respondents contend that FINRA's application of Rule 2010 to conduct that violates any securities laws other than the Exchange Act is an unauthorized and unilateral attempt to enlarge FINRA's jurisdiction beyond its congressional grant.

### (2) Contrary To Respondents' Argument, FINRA Has Jurisdiction To Bring This Proceeding

#### a. The Exchange Act Expressly Authorizes This Proceeding

Respondents are incorrect. The Exchange Act expressly grants FINRA authority to promote just and equitable principles of trade—a broad grant of authority. The statute does not limit FINRA to enforcement of the Exchange Act.

In every place where the Exchange Act describes FINRA's authority, including Sections 15A(b)(2) and (b)(7), 15A(h), and 19(g), the statute expressly authorizes and requires FINRA to promulgate and enforce its own rules. Congress then defined the permissible scope of FINRA's rules to encompass much more than violations of the Exchange Act.

In a provision that Respondents have completely ignored, Section 15A(b)(6), the Exchange Act expressly grants FINRA broad authority to adopt and enforce rules to promote fair business conduct and to protect securities investors and markets in general. In fact, Section 15A(b)(6) uses the identical language contained in Rule 2010, providing in pertinent part that FINRA's rules should be designed "to promote just and equitable principles of trade." Thus, Congress expressly authorized FINRA to promulgate and enforce the very Rule that FINRA seeks to enforce in this proceeding.[11]

Notably, in authorizing FINRA "to promote just and equitable principles of trade," Congress spoke of fair and equitable business conduct generally. It did not limit FINRA to unfair and inequitable conduct relating to a violation of the Exchange Act. Furthermore, Congress authorized FINRA to adopt and enforce rules to promote good conduct, not merely to sanction bad conduct. This further enlarged FINRA's jurisdiction in promulgating and enforcing its rules.

The other language in Section 15A(b)(6) is similarly broad and confirms that Congress intended to authorize FINRA to do more than proceed against violations of the Exchange Act. The statute directs that FINRA's rules also should be designed "to perfect the mechanism of a free and open market" and "in general, to protect investors and the public interest." These phrases contain no qualifying proviso limiting FINRA's jurisdiction to violations of the Exchange Act.

Congress did limit the subject matter of FINRA's rules, but not in the way that Respondents contend. Congress wrote with a broad stroke that FINRA's rules should "relate" to the "purposes" of the Exchange Act. Section 15A(b)(6) provides that FINRA is not authorized

---

[11] Section 15A(g)(3) uses the same language to authorize FINRA to deny membership to a firm or person (or to bar them) if they have engaged or are reasonably likely to engage in "acts or practices inconsistent with just and equitable principles of trade." This language contains no restriction to conduct unlawful under the Exchange Act.

to regulate "matters not related to the purposes" of the Exchange Act and FINRA's administration.

The purposes of the Exchange Act are set forth in Section 2 of the Act. Among other things, Section 2 specifies that rules and regulations should be "reasonably complete and effective" in order "to insure the maintenance of fair and honest markets" for securities transactions.[12] By this language, Congress granted FINRA broad authority to develop and enforce rules designed to protect investors and foster integrity in the securities markets.

The broad authority granted to FINRA encompasses the kind of misconduct alleged here. Indeed, it would make no sense from a policy perspective if it did not. If Respondents were correct, and FINRA could not discipline a member firm and its associated persons for violating the Securities Act, the regulatory system established by the Exchange Act would be rendered ineffective. As Respondents would have it, FINRA could do nothing, even if a member firm and its associated persons were flagrantly violating the Securities Act. That is inconsistent with the mission that Congress expressly gave the organization.

Respondents attempt to make sense of their construction of the statute by misreading Section 19(h) of the Exchange Act. As noted above, they argue that that provision makes the SEC the *exclusive* enforcer of the Securities Act. The argument is without foundation. Section 19(h) of the Exchange Act contains no language indicating that the SEC has exclusive authority over violations of the Securities Act. Nor does it contain language precluding FINRA from disciplining its members and their associated persons for misconduct of any kind, including violations of the Securities Act. Section 19(h) simply grants the SEC certain disciplinary authority without reference to FINRA.

In sum, the statute on its face authorizes this proceeding. It does not restrict FINRA's jurisdiction in the way that Respondents contend.

### b. No Authority Supports Respondents' Reading Of The Statute

The SEC has consistently viewed FINRA Rule 2010 as a broad proscription not only against violations of the securities laws, but even against unethical conduct that may not be unlawful.[13] As the SEC recently said, it even applies to business-related conduct that does not involve a security.[14] The Rule is "designed to enable [FINRA] to regulate the ethical standards

---

[12] 15 U.S.C. § 78b (2012). This limitation refutes Respondents' *in terrorem* argument that allowing FINRA to proceed against violations of the other securities laws could lead to FINRA's assertion of its disciplinary authority to any law regardless of its subject matter. Summary Disposition Motion at 8-9. FINRA's exercise of its disciplinary authority is sensibly restrained—it must serve the purposes of the Exchange Act. Those purposes include protecting investors and the integrity of the securities markets generally.

[13] FINRA Rule 2010 has been long understood to apply to "a wide variety of conduct that may operate as an injustice to investors or other participants in the marketplace." *Daniel Joseph Alderman*, 52 S.E.C. 366, 369 (July 20, 1995), *aff'd*, 104 F.3d 285 (9th Cir. 1997). *See also Dep't of Enforcement v. Fretz*, No. 201002488950, 2015 FINRA Discip. LEXIS 54, at *10-11 (NAC Dec. 17, 2015) (FINRA Rule 2010 extends to practices that are unfair to investors or hinder the functioning of free and open markets, even if those practices are not unlawful).

[14] *Keilen Dimone Wiley*, Exchange Act Release No. 76558, 2015 SEC LEXIS 4952, at *11 (Dec. 4, 2015) (citations omitted).

of its members."[15]   Conduct that is inconsistent with just and equitable principles of trade reflects negatively on a person's ability to comply with regulatory requirements fundamental to the securities industry.[16]   Enforcement of this broad ethical standard is related to the broad purposes of the Exchange Act because it protects investors and promotes fair and honest markets.

     While acknowledging that numerous cases have held that FINRA is empowered to investigate and discipline its members and their associated persons for unethical conduct, even if that conduct does not violate the securities laws, Respondents argue that the cases are distinguishable from the case at hand.  Respondents assert that the cases involve misconduct that would not be subject to securities-industry oversight absent FINRA Rule 2010, such as misuse of customer funds.[17]   Thus, in Respondents' view, FINRA's jurisdiction extends to unethical conduct that is not unlawful under the securities laws but would not extend to unethical conduct in violation of any securities laws but the Exchange Act.

     Respondents cite no authority for this purported limit on the type of unethical misconduct covered by FINRA Rule 2010.  Nor do they explain why Congress would have intended to limit FINRA's jurisdiction in that way.  Such a limit, in fact, would be inconsistent with Congress's broad grant of authority to FINRA, and would severely hamper FINRA's ability to protect investors and promote fair and honest markets.  It would make no sense.

     The SEC has never questioned FINRA's authority to bring disciplinary proceedings for misconduct related to a violation of Section 5 of the Securities Act.  As Respondents concede, FINRA has routinely brought charges against members and associated persons under Rule 2010 for misconduct in connection with the sale of unregistered non-exempt securities, and the SEC has sustained such charges.[18]

     Most recently, in *ACAP Financial, Inc.*, the SEC upheld FINRA's findings and sanctions against a firm and its compliance officer for their failure to investigate red flags to ensure that a registered representative was not involved in an unlawful, unregistered distribution of penny stock.[19]   In its decision, the SEC discusses numerous prior disciplinary proceedings involving charges that persons subject to FINRA's jurisdiction had engaged in misconduct related to sales of unregistered securities in violation of Section 5 of the Securities Act.  The SEC never

---

[15] *Blair Alexander West*, Exchange Act Release No. 74030, 2015 SEC LEXIS 102, at *19 (Jan. 9, 2015) (quoting *Heath v. SEC*, 586 F.3d 122, 132 (2d Cir. 2009) (discussing NYSE Rule 476, a counterpart to what is now FINRA Rule 2010).

[16] *Geoffrey Ortiz*, Exchange Act Release No. 58416, 2008 SEC LEXIS 2401, at *22 (Aug. 22, 2008).

[17] Summary Disposition Reply at 3-4 and n.4.

[18] Respondents cited a decision by FINRA's National Adjudicatory Council ("NAC") as an example, *Dep't of Enforcement v. Midas Securities. LLC*, No. 2005000075703, 2011 FINRA Discip. LEXIS 62, at *2 n.1 (NAC Mar. 3, 2011) ("A violation of Securities Act Section 5 … constitutes a violation of NASD Rule 2110 [the identical predecessor of FINRA Rule 2010]").  Summary Disposition Motion at 7-8.  The SEC sustained the NAC decision in that proceeding as to both the finding of violation and the sanctions.  *Midas Securities, LLC*, Exchange Act Release No. 66200, 2012 SEC LEXIS 199 (Jan. 20, 2012).  In sustaining the NAC decision, the SEC repeated, "A violation of Securities Act Section 5 also violates NASD Rule 2110." *Id.* at *46 n.63.

[19] *ACAP Financial, Inc.*, Exchange Act Release No. 70046, 2013 SEC LEXIS 2156 (July 26, 2013).

questions FINRA's jurisdiction to bring disciplinary proceedings for such misconduct. Rather, the SEC treats FINRA's disciplinary proceedings as an appropriate adjunct to its own efforts to require that broker-dealers be attentive to signs that a sale of unregistered securities could be an unlawful distribution.

The SEC declared in *ACAP*, "We have stressed the responsibility of broker-dealers to prevent their firms from being used as conduits for illegal distributions, such use having frequently been a major factor in the success of such unlawful activity."[20] This comment in the *ACAP* decision makes plain the connection between misconduct in violation of Section 5 of the Securities Act and the purposes of the Exchange Act. One of the purposes of the Exchange Act is to maintain a fair and honest securities market. That purpose would be subverted if insiders could evade the disclosures required for registered securities and flood the public markets with unregistered securities. FINRA member firms and their associated persons are obligated to assist in monitoring and preventing such illegal activities in order to protect investors and the integrity and honesty of the market. FINRA enforces their compliance by using FINRA Rule 2010 and requiring member firms and their associated persons to observe high standards of commercial honor and just and equitable principles of trade—just as it is authorized to do by Congress.

Federal courts have upheld SEC decisions affirming FINRA sanctions for violations of the Securities Act. Those judicial decisions also have not questioned FINRA's jurisdiction to act against violations of the Securities Act.[21] The Ninth Circuit has described the sale of unregistered securities in violation of the Securities Act as an "obvious violation" of the duty to adhere to high standards of commercial honor and just and equitable principles of trade.[22]

In the face of consistent regulatory and judicial acceptance of FINRA's broad jurisdiction to protect investors and the securities markets, Respondents cite only a 1982 article written by two persons who were then members of the SEC staff. That article describes disciplinary proceedings as they were conducted by FINRA's predecessor, NASD. With respect to the issue of jurisdiction, the article does no more than present, without analysis, the authors' view that at that time they considered it an open question whether the Exchange Act restricts FINRA from enforcing the Securities Act.[23] To the extent the question was unresolved in 1982, it has been determined conclusively over the ensuing 34 years that FINRA is not so restricted.

The plain words of the statute and consistent regulatory and judicial precedents contradict the article. FINRA's jurisdiction to take action against violations of the Securities Act is not an open question. FINRA has the jurisdiction it exercises here.

---

[20] *Id.* at \*87 n.178 (citations omitted).

[21] *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243 (9th Cir. 2014); *Kunz v. SEC*, 64 F. App'x 659, (10th Cir. 2003); *Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982).

[22] *Sorrell*, 679 F.2d at 1326.

[23] Summary Disposition Motion at 7-8 and n.9, which discusses Lee A. Pickard & Anthony W. Djinis, *NASD Disciplinary Proceedings: Practice and Procedure*, 37 Bus. Law. 1213, 1219 (1982).

### B. Respondents Hurry And DiBlasi Have Not Met The Standard For Summary Disposition

Respondents Hurry and DiBlasi have separately moved for summary disposition with respect to the claims against them.

### (1) Movants Must Show That There Are No Material Facts In Dispute

Summary disposition in a FINRA disciplinary proceeding is governed by FINRA Rule 9264. FINRA Rule 9264(d) requires that any such motion be accompanied by a statement of undisputed facts, a memorandum of points and authorities, and an affidavit or declaration setting forth facts that would be admissible at the hearing.[24] FINRA Rule 9264(e) permits summary disposition only if there is "no genuine issue with regard to any material fact" and, based on undisputed material facts, the party that files the motion is "entitled to summary disposition as a matter of law."

Rule 9264(e) further provides that the facts alleged in the non-movant's pleadings shall be taken as true unless modified by stipulations or admissions, uncontested affidavits or declarations, or facts subject to official notice. Summary disposition cannot be granted unless the movant presents an adequate basis for concluding that the material facts are not, or cannot reasonably be, disputed.

FINRA Rule 9264 is consistent with Federal Rule of Civil Procedure 56 concerning summary judgment, which can be consulted in a FINRA disciplinary proceeding for guidance.[25] In connection with a motion for summary judgment under Federal Rule of Civil Procedure 56, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in favor of the party opposing the motion.[26] Summary judgment cannot be granted if there is disagreement over the inferences that could reasonably be drawn from those facts.[27] Furthermore, even if a summary judgment motion is not

---

[24] Respondents Hurry and DiBlasi did not submit a separate statement of undisputed facts or any affidavits or declarations. Respondents did submit excerpts from on-the-record ("OTR") testimony and other materials to support their arguments. Enforcement presented a statement of disputed facts. It also submitted an affidavit of a FINRA examiner accompanied by excerpts of OTR testimony, emails, and other evidence to support its position.

[25] FINRA disciplinary proceedings are governed by FINRA's own procedures, as set forth in the Rule 9000 Series. Neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence are binding, although they and the case law developed under their auspices may be consulted for guidance as appropriate. OHO Order 12-02 (2011029760201) (Apr. 5, 2012), http://www.finra.org/sites/default/files/ohodecision/p126070.pdf at 5.

[26] *See, e.g., Tolan v. Cotton,* __ U.S. __, 134 S. Ct. 1861, 1863, 1866 (2014); *Crawford v. Metropolitan Gov't of Nashville & Davidson County,* 555 U.S. 271, 274 n.1 (2009); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986) *(citing United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).

[27] *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 744 (3d Cir. 1996).

contested, and thus no dispute of material fact is demonstrated, summary judgment may only be awarded where the moving party should prevail as a matter of law.[28]

### (2) Respondents Have Failed To Show That There Are No Material Facts In Dispute And That They Are Entitled To Prevail

#### a. Hurry

Respondent Hurry repeatedly asserts that there is no evidence that he was involved in the transactions at issue.  He asserts that Enforcement's case against him consists of nothing more than his ownership interest in Cayman Securities and fact that he is a director of the Firm.  On this basis, he claims he is entitled to prevail.[29]

The level of Hurry's involvement in the transactions is a material fact, and it is in dispute. Enforcement alleges facts in the Complaint that must be taken as true under FINRA Rule 9264(e) because they have not been modified by stipulation, admission, uncontested affidavit or declaration, or official notice.  Those facts contradict Hurry's assertion that he was not involved in the transactions.

Enforcement alleges not merely that Hurry owned Cayman Securities, but, as discussed above, that he set up Cayman Securities, brought all its customers to it, purposely staffed it in a way that made it unlikely that it could establish and implement appropriate systems for handling its microcap liquidation business, and maintained day-to-day control.  These facts, which are deemed to be true for purposes of this Summary Disposition Motion, could support an inference that Hurry intentionally engaged in activities to avoid regulatory oversight and facilitate violations of the Securities Act.

In addition, Enforcement presented OTR testimony that supports the factual allegations of the Complaint.  According to that testimony, Hurry called staff at Cayman Securities frequently and at all hours regarding details of its business.[30]  In particular, he sought daily updates on the number of trades placed and the specific stock certificates approved for deposit by issuer and dollar amount.[31]  He also was involved in decisions about which customer relationships to maintain and develop.  One former employee of Cayman Securities testified, "We weren't able to make those decisions and have them last.  We were typically overruled by John Hurry if there were things that we wanted to put in place, whereas, you know, we want to fire this client, they waste too much [of] our time, we don't believe that they are being forthright with giving us information…."[32]  When coupled with the allegation that Hurry brought in all the customers of Cayman Securities, this testimony could support the inference that Hurry generated

---

[28] *See Edwards v. Aguillard*, 482 U.S. 578, 595 (1987); *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 9 (1st Cir. 2003).

[29] Summary Disposition Motion 2, 13, 17-18; Summary Disposition Reply 6-11.

[30] Summary Disposition Opposition 13 nn.53 through 57.

[31] Summary Disposition Opposition 13 n.55.

[32] Summary Disposition Opposition 13-14 n.58.

the transactions and shepherded them through to completion, sometimes overriding a staff decision to reject a client's business because of the staff's discomfort with the lack of disclosure.

Even Respondents presented excerpts of OTR testimony that contradict Hurry's assertion that he was not involved.  Those excerpts could support an inference that Hurry engaged in conduct designed to avoid regulatory oversight of the transactions.  A former Cayman Securities employee testified that Hurry would call him on FaceTime and ask him to call customers on his landline.  Then the employee would hold the telephones together.[33]  This manner of conducting the telephone conversation would avoid a telephone record that Hurry had talked to the customer and would thereby conceal Hurry's involvement.  These facts, if proven at the hearing, would bolster the inference that Hurry was the architect of the transactions and designed them to evade regulatory scrutiny.

Thus, Hurry's level of involvement is in dispute.  Whether his involvement amounted to the requisite level for liability is also in dispute.  He has not met the standard for summary disposition.

### b.  DiBlasi

DiBlasi contends that Enforcement's case against him stems from an erroneous reading of the Firm's WSPs.  He contends that the WSPs provide that the Firm's Management Committee was responsible for establishing procedures related to sales of unregistered securities, not DeBlasi.[34]

Enforcement points out that DiBlasi's contention is not supported by affidavit or sworn declaration.[35]  It further points out that DiBlasi testified in his OTR that he was responsible for updating the WSPs.[36]  Two versions of the Firm's WSPs specified that the Firm's Chief Compliance Officer was responsible for establishing and maintaining the WSPs, and DiBlasi was the Chief Compliance Officer.[37]

Even more significantly, Enforcement cites OTR testimony indicating that DeBlasi was a member of the Firm's Management Committee.[38]  DiBlasi omitted that fact from Respondents' Summary Disposition Motion.  However, in the Summary Disposition Reply he admitted that he was a member of the Firm's Management Committee, and he discussed at some length the intricacies of the Firm's management structure, the WSPs, and his responsibilities.[39]  In the Reply, he portrayed his role as one of coordination.  He quoted his own OTR testimony where he claimed with respect to the WSPs that "Everybody is responsible for it.  I could not specifically

---

[33] Summary Disposition Motion, Exhibit G.

[34] Summary Disposition Motion 19.

[35] Summary Disposition Opposition 25-26.

[36] Summary Disposition Opposition 27 n.132.

[37] Summary Disposition Opposition 26-29.

[38] Summary Disposition Opposition 30 n.136 (citing Hurry OTR, 327-28; Cruz OTR, 9-10).

[39] Summary Disposition Reply 11-14.

approve them on my own."[40]  This discussion itself demonstrates that a hearing is required to fully understand what DiBlasi's responsibilities were, how he exercised them, and whether he committed the violations alleged in the Complaint.

DiBlasi has failed to show that there are no material facts in dispute regarding his supervisory responsibilities.

## IV.   Discussion Of Disqualification Motion

### A.  Background

Cayman Securities is a Cayman Islands entity subject to the laws of the Cayman Islands, including the Cayman Islands Confidential Relationships Preservation Law ("CRPL"). According to Respondents, the CRPL requires professional persons to maintain the confidentiality of information belonging to their clients unless the clients consent to disclosure. Improper disclosure can trigger criminal penalties.[41]

FINRA issued a Rule 8210 request to Hurry on September 19, 2014, seeking to compel him to produce documents and information concerning Cayman Securities, including not only its corporate documents but also account documents and brokerage statements of current and previous customers.[42]  Although some customers consented to the release of their confidential information, two did not.  Those two have been implicated in a substantial alleged fraudulent scheme in violation of U.S. securities laws.  They and their principals have been indicted in the Eastern District of New York on charges of securities fraud, tax fraud, and money laundering.[43]  They also are alleged to have liquidated some of the microcap shares at issue in violation of Section 5 of the Securities Act.

After receiving the Rule 8210 request, Hurry (along with Cayman Securities) applied to the Grand Court of the Cayman Islands for directions concerning the CRPL.  Based on the information presented by Hurry and Cayman Securities,[44] the Cayman court declined to permit them to disclose confidential information relating to the two customers of Cayman Securities without the customers' consent.[45]  Hurry's U.S. counsel provided a copy of the Cayman court's Ex Tempore Ruling to Enforcement by letter dated October 14, 2014.[46]  The ruling does not purport to prohibit FINRA from proceeding with this enforcement action.

Thereafter, Enforcement interviewed CD, a former staff member of Cayman Securities, on November 10, 2014, and GR, Cayman Securities' former Managing Director and General

---

[40] Summary Disposition Reply at 13.

[41] Disqualification Motion 20.

[42] Disqualification Motion, Exhibit C, tab 2.

[43] Disqualification Motion 21; Exhibit A and Exhibit C, tab 1.

[44] According to the court's ruling, neither customer responded to the application or appeared at the hearing.

[45] Disqualification Motion, Exhibit B.

[46] Disqualification Motion, Exhibit C.

Counsel, on May 27, 2015.  The interviews took place in California.  Some of the testimony related to the two clients implicated in the alleged violations of U.S. securities laws.  Some of the testimony related to Hurry's activities in connection with Cayman Securities.[47]

### B.   Respondents Argue That Enforcement Counsel Has Behaved Unethically And Should Be Disqualified

Respondents contend that the CRPL applies to anyone inside or outside the Cayman Islands who obtains confidential information that arises in, or is brought into, the Cayman Islands.[48]  They further contend that the Cayman court ordered that confidential information relating to the two clients could not be disclosed to Enforcement.  On that basis, Respondents argue that when Enforcement took the testimony of CD and GR, Enforcement engaged in knowing unethical conduct.[49]  Respondents characterize Enforcement as disregarding the Cayman court's "mandates," and as improperly "press[ing]" for prohibited testimony.[50]  In support of their argument they submitted a declaration of a Cayman Islands-licensed attorney, which concludes that GR and Enforcement both violated the CRPL.[51]

Respondents urge that disqualification of Enforcement counsel is the appropriate remedy, citing the American Bar Association's Standards for Criminal Justice.  Those standards counsel that a criminal prosecutor should take steps to limit the taint of illegally obtained evidence and determine whether the evidence can be lawfully used in court.  Respondents also note that a lawyer in a civil matter may be disqualified when exposed to an opponent's privileged material, depending on factors such as whether the attorney knew or should have known the material was privileged, the extent to which the attorney studied the privileged information, and the significance of the privileged information.[52]

### C.   Respondents Have Not Shown That Enforcement Counsel Behaved Unethically

Although Respondents did not refer to it in their Disqualification Motion, FINRA Rule 9150 authorizes a FINRA adjudicator to exclude an attorney from appearing in a FINRA disciplinary proceeding for "contemptuous conduct" or "unethical or improper professional conduct in that proceeding."  Accordingly, the Hearing Officer has the authority to grant the requested relief if the circumstances warrant it.  Here, the Hearing Officer finds that they do not.

As an initial matter, in this forum, motions to disqualify counsel for unethical conduct are extremely rare.  Where such motions have been considered, federal judicial precedents have been

---

[47] Disqualification Motion, Exhibits G and I.

[48] Disqualification Motion 20.

[49] Disqualification Motion 21-22.

[50] Disqualification Motion 21-22.

[51] Disqualification Motion, Exhibit J.

[52] Disqualification Motion 22-23.

relied upon to resolve the issue.[53]  Under those precedents, the burden on a movant seeking to disqualify counsel for alleged ethical misconduct is a high one.[54]  Generally, in civil cases motions to disqualify counsel are disfavored because disqualification deprives a party of the right to employ counsel of his choice,[55] and because such motions are often made for tactical reasons to disrupt and delay the proceeding.[56]  Disqualification is an appropriate remedy only where the misconduct at issue would affect the integrity of the adversary process.[57]

With that high standard in mind, the Hearing Officer turns to examine whether Respondents have shown that Enforcement engaged in unethical conduct.  Respondents' assertion that Enforcement counsel behaved unethically is grounded on the false premise that the ruling of the Cayman court automatically trumps all other considerations and immediately required Enforcement to cease any further inquiries regarding Cayman Securities and its clients.  Respondents' assertion rests also on a mischaracterization of Enforcement's conduct.

It is well-established that foreign statutes protecting the secrecy of confidential information and "blocking" disclosure do not automatically override and stymy the enforcement of U.S. law.   As the U.S. Supreme Court said in *Aerospatiale*, in discussing a French blocking statute and a U.S. District Court discovery order,

> It is well settled that such [blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute.[58]

The Court further explained in *Aerospatiale* that one sovereign entity is not required to adhere blindly to the directive of another sovereign entity.  Rather, an intricate interplay of concerns has to be examined in determining whether disclosure may be required in one jurisdiction despite a blocking statute in another jurisdiction.[59]  Comity requires that the "exact line between reasonableness and unreasonableness" of disclosure be determined by the specifics of the case, the claims and interests of the parties, and the governments whose statutes and policies they invoke.[60]

---

[53] OHO Order 03-10 (CMS020143) (Apr. 3, 2003), http://www.finra.org/sites/default/files/ohodecision/p007706.pdf (denying motion to disqualify counsel) at 3; OHO Order 98-14 (CAF970011) (Jan. 29, 1998), http://www.finra.org/sites/default/files/ohodecision/p007701.pdf (denying motion to disqualify counsel) at 2-4.

[54] *See Skidmore v. Warburg Dillon Read LLC*, No. 99 Civ. 10525, 2001 U.S. Dist. LEXIS 6101, at *4-5 (S.D.N.Y. May 11, 2001).

[55] *Advanced Manufacturing Technologies, Inc. v. Motorola, Inc.*, No. CIV 99-01219, 2002 U.S. Dist. LEXIS 12055, at *7 (D. Ariz. July 3, 2002).

[56] *Skidmore*, 2001 U.S. Dist. LEXIS 6101, at *5.

[57] OHO Order 98-14 (CAF970011) at 3.

[58] *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 544 (1985), citing *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-06 (1958).

[59] *Id.*

[60] *Id.* at 545.

In *Aerospatiale*, the Supreme Court discussed the kind of comity analysis that is required. It identified five factors to consider: (1) the importance of the information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the relative interests of the United States and the foreign nation.[61]  Courts in the Second Circuit also consider the following additional factors: (6) the hardship of compliance on the party or witness; and (7) the good faith of the party resisting discovery.[62]

Without going into a full comity analysis, it is plain here that the Cayman court's ruling did not absolutely bar Enforcement from further inquiries about Cayman Securities and its customers. The fifth factor, the balancing of national interests, and the seventh factor, the good faith of the party resisting disclosure both weigh against concluding that the Cayman court's ruling foreclosed Enforcement's continued inquiries.

At stake here is the interest of the United States in the enforcement of its securities laws. Although FINRA is not a government agency, it plays an important role in enforcing the federal securities laws. As discussed above, FINRA exercises its disciplinary powers pursuant to congressional grant. Even in private litigation, the interests of the United States may weigh heavily in the comity analysis of a conflict between U.S. law and foreign blocking statutes.[63]

In this case, Enforcement was investigating and gathering evidence relating to potential violations of federal law and the rules and regulations that govern participants in the U.S. securities industry. Some of the evidence was sought from Hurry, a regulated person under the U.S. securities laws who knew that he was required to provide documents and information that were within his ownership, custody, or control. Other evidence was sought from other persons, both regulated and unregulated. Enforcement uncovered facts that suggest that Hurry may have used Cayman Securities to evade regulatory oversight of his actions and enable the public distribution of non-exempt unregistered securities in the United States in violation of Section 5 of the Securities Act and FINRA's Rule 2010. In that context, Enforcement took the testimony of two former Cayman Securities employees.

---

[61] *Id.* at 544 n.28.

[62] *SEC v. Gibraltar Global Sec., Inc.*, 2015 U.S. Dist. LEXIS 43773, at *9-10 (Apr. 1, 2015).  *See generally SEC v. CKB168 Holdings, Ltd.*, 13-CV-5584, 2015 U.S. Dist. LEXIS 106812, at *21-22 (S.D.N.Y. Jan. 7, 2015) (It is well-established that foreign law is no excuse for failing to comply with U.S. discovery obligations, even if doing so might violate foreign law); *Motorola Credit Corp. v. Kemal Uzan*, 73 F. Supp. 3d 397, 403 (S.D.N.Y. Dec. 22, 2014) (as made plain in *Aerospatiale*, a court does not have to give way to foreign blocking statute); *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91 (S.D.N.Y. Feb. 13, 2014) (motion to quash subpoena for documents from Israeli bank that argued complying would violate Israel's confidentiality laws denied after conduct of comity analysis).

[63] *See Courtney Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. Jan. 18, 2013). In that private damage action, the defendant bank resisted discovery, arguing that foreign bank secrecy laws would subject it to criminal prosecution and other penalties if it disclosed the information. The Second Circuit upheld the district court's sanctions for the bank's failure to comply with the discovery orders. The district court permitted the jury to infer from the failure to produce the documents that the bank had provided financial services to foreign terrorist organization and that the bank had done so knowingly. Although it was a private action, the interests of the United States in enforcing its laws were a concern included in the comity analysis. *Id.* at 98.

Where enforcement of the U.S. securities laws is at stake, it has been held that the interest of the United States in disclosure is particularly strong.[64]  Where an interest in U.S. law enforcement has come into conflict with the Cayman Islands statute protecting against disclosure, U.S. courts have noted that the statute does not provide a blanket guarantee of privacy and has many exceptions.[65]  They also have noted that the government of the Cayman Islands has a policy against the use of its business secrecy laws to encourage or foster criminal activities.[66]  Two federal courts of appeals have held that information protected by the CRPL should be disclosed in U.S. proceedings.[67]  These considerations weaken the claim that secrecy is so important to the Cayman Islands that it is paramount to the interest of the United States in enforcing its securities laws.

Although this is a disqualification motion, Hurry is in a position analogous to that of a person resisting disclosure.  It was his decision to set up Cayman Securities and funnel foreign business through it to the Firm.  He created the impediment to disclosure and the supposed conflict between Cayman Islands law and the investigation of potential misconduct in the United States.  By his disqualification motion he seeks to further advantage himself and resist regulatory oversight.

The seventh factor, the good faith of the party resisting disclosure, is instructive in this context.  "[A] foreign law's prohibition of discovery is not decisive of the issue.  A noncomplying party's good or bad faith is a vital factor to consider."[68]  Where a party deliberately "courted" the legal impediments to disclosure, it would be unjust to allow those impediments to interfere with the enforcement of U.S. law.[69]  Courts routinely examine whether the party resisting discovery on the basis of foreign law prohibitions "fostered" problem by its own conduct.[70]

Given the strong interest of the United States in the enforcement of the securities laws, and the fact that Enforcement counsel sought disclosure in an effort to enforce those laws, and given other circumstances that suggest that Hurry likely acted to avoid regulations designed to

---

[64] *See SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 112, 117 (S.D.N.Y. 1981) (disclosure was "required to preserve our vital national interest in maintaining the integrity of the securities markets against violations committed and/or aided and assisted by parties located abroad").

[65] *In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d 817, 828 and n.15 (11th Cir. 1984).

[66] *Nova Scotia*, 740 F.2d at 827 ("It would therefor appear that the policy of the legislature is that the Confidentiality Laws of the Cayman Islands should not be used as blanket device to encourage or foster criminal activities.") (citation omitted).

[67] Nova *Scotia*, 740 F.2d 817 (subpoena and sanctions issued to a Cayman bank branch, despite Cayman Grand Court denial of request to release information in question); *In re Grand Jury Proceedings Field*, 532 F.2d 404 (5th Cir. 1976) (affirming contempt order against a Canadian citizen residing in Caymans for failure to provide testimony to a U.S. court, despite potential that he might be subject to criminal prosecution for violation of CRPL).  A third court of appeals has similarly upheld a trial subpoena that required an individual to issue a directive to a Cayman Islands branch bank consenting to disclosure.  *United States v. Davis*, 767 F.2d 1025 (2d Cir. 1985),

[68] *Banca Della Svizzera*, 92 F.R.D. 111, 114.

[69] *Id.* at 118-119.

[70] *Minpeco, S.A. v. Conticommodity Services, Inc.*, 16 F.R.D. 517, 522-23, 528-29 (S.D.N.Y. 1987).

ensure compliance with those laws, it cannot be said that the ruling by the Cayman court dictated that Enforcement counsel could not take the testimony of persons in the United States who had knowledge relevant to this disciplinary proceeding.

Furthermore, the tone and substance of the questions and answers in the excerpts of OTR testimony submitted in connection with the Disqualification Motion and Disqualification Opposition do not show that Enforcement pressured the witnesses to break confidences or privileges.  It is not even clear that the information provided by the witnesses was covered by the confidentiality protections of the CRPL.  Respondents' characterization of Enforcement's conduct simply does not correspond to the reality.

Finally, it should be noted that even if Enforcement had pressured the witnesses to provide confidential information, the witnesses were the persons who were put at risk of sanctions for violating Cayman Islands law, not Respondents.  Respondents are not the appropriate persons to seek a "remedy."[71]

In light of (1) the high burden on Respondents to show unethical conduct that would warrant the extreme remedy of disqualification, (2) the complexity of the comity analysis and the factors tipping in favor of disclosure rather than secrecy, and (3) the record submitted in briefing on the Disqualification Motion, the Hearing Officer finds that Enforcement did not act unethically and there is no basis for disqualifying Enforcement counsel.

## V.    Order

For the foregoing reasons, Respondents' Summary Disposition Motion and their Disqualification Motion are both **DENIED**.

**SO ORDERED.**

_____
Lucinda O. McConathy
Hearing Officer

Dated:        February 26, 2016

---

[71] *See Davis*, 767 F.2d 1025, where the Second Circuit upheld a trial subpoena ordering the defendant to issue a directive to a bank in the Cayman Islands to disclose information.  The defendant had argued that the bank was subject to criminal prosecution in the Cayman Islands for providing the bank records at issue and, therefore, the records should not have been admitted.  The Second Circuit noted that the potential sanction for violation was more properly raised by the bank. *Id.* at 1033.

18

Copies to:

    Kevin J. Harnisch, Esq. (via electronic and first-class mail)
    Ryan E. Meltzer, Esq. (via electronic mail)
    Gerald J. Russello, Esq.(via electronic and first-class mail)
    Dean M. Jeske, Esq. (via electronic and first-class mail)
    Michael A. Gross, Esq. (via electronic mail)
    Aimee Williams-Ramey, Esq. (via electronic mail)
    Laura Blackston, Esq. (via electronic mail)
    Heather Freiburger, Esq. (via electronic mail)
    Jeffrey Pariser, Esq. (via electronic mail)